# Exhibit 1

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                      OF THE TRIAL COURT

HAYAT SINDI,                )
                            )
        Plaintiff,          )
                            )
                            )        13-0329 A
v.                          )        Civil Action No._____
                            )
SAMIA EL-MOSLIMANY and      )
ANN EL-MOSLIMANY,           )
                            )
        Defendants.         )
                            )

## COMPLAINT AND JURY DEMAND

### i. Introduction

1.  By and through this action, Plaintiff Hayat Sindi seeks substantial money damages

    arising from Defendants, Samia El-Moslimany's and her mother, Ann El-Moslimany's

    knowing, intentional, and malicious campaign of defamation.  Beginning in or around

    September 2011 and continuing through today, Defendants have engaged in a relentless

    course of conduct designed and intended to publicly embarrass, humiliate, and destroy

    Plaintiff through the perpetuation of intentional falsehoods.  This conduct has been

    undertaken in writing, orally, and over the Internet and, at its core, seeks to exact revenge

    for some perceived wrong committed by Plaintiff against Samia El-Moslimany which, in

    actuality, never happened.  Defendants have sought to tarnish Plaintiff's reputation and

    publicly humiliate her by, among other things, falsely accusing Plaintiff of engaging in

    fraud, misrepresenting her professional credentials, engaging in illegal misconduct,

    plagiarizing her scientific research and publications, and other libels which are

demonstrably false and defamatory per se.  In addition to seeking substantial money damages, Plaintiff seeks a permanent injunction against Defendants to prevent their ongoing, relentless and dangerous misconduct which, if not stopped, will lead to significant and irreparable consequences to Plaintiff.

### ii. The Parties

2. Plaintiff Hayat Sindi ("Ms. Sindi") is a resident of 151 Tremont Street, Boston, Massachusetts.

3. Defendant Samia El-Moslimany is a resident of 2655 SW 151st Place, Burien, Washington State.

4. Defendant Ann El-Moslimany is a resident of 2107 NE 54th St., Seattle, Washington State.

### iii. Jurisdiction and Venue

5. Jurisdiction is proper in this Court because Plaintiff Hayat Sindi is a resident of the forum and the damages at issue amount to more than $25,000.

6. In addition, jurisdiction is proper under the Massachusetts Long Arm Statute as a substantial number of the acts and omissions that gave rise to this lawsuit took place in and around Massachusetts and caused tortious injury to Plaintiff in Massachusetts. Among other acts, Defendants personally traveled from Washington State to Boston, Massachusetts to slander and libel Plaintiff in her very neighborhood, as evidenced by Defendant Samia El-Moslimany's admissions on Facebook.

2

### iv. Facts

a. **Hayat Sindi's Early Life and Achievements**

7. Ms. Sindi is an accomplished scientist, entrepreneur, and philanthropist; she has founded or co-founded three businesses and/or non-profit companies; she has been distinguished by awards and honors from the British House of Commons, Cambridge University, the Massachusetts Institute of Technology, UNESCO, Harvard Business School, and the U.S.A. Science and Engineering Festival; and she is named as inventor or co-inventor on nine patents in the European Union, the United States, Canada, Japan, and China. The technology she has helped to invent and develop literally saves lives.

8. Ms. Sindi is also an individual who has persevered and succeeded throughout her career against all odds. At the time of her birth in Saudi Arabia in and around the ancient city of Mekkaa, only 2% of women could read and write, but Ms. Sindi, by virtue of her and her family's sacrifice, was able to go to school. Through her educational experience, Ms. Sindi not only learned to read and write in her native language but also studied English.

9. Ms. Sindi's early education was not the last time that she would beat all odds. As a girl, Ms. Sindi dreamed of someday becoming a great scientist, and she developed ambitions to study abroad, something virtually unheard of for a Saudi girl. She wanted to study pharmacology, but she could not study this subject in any of the Saudi Universities at that time. So she sat down with her father and mother to tell them that she wanted to study pharmacology in the United Kingdom. She had avidly read any and all materials she could find on universities in Great Britain and had decided she wanted to go to King's College of London and Cambridge University. At first, her father adamantly refused, fearing that his daughter would be vulnerable and alone. Ms. Sindi told him that she

3

knew that the British universities would accept her because she was a good student, and eventually this won him over. Her parents agreed to allow her to go.

10. In 1990, Ms. Sindi arrived in London, United Kingdom. At that time, she did not know she had to take the A-Level Exams to qualify her to enter any British university. She had no personal experience with Great Britain's rigid hierarchy of education, but she learned quickly, the hard way. At first her English skills did not yet suffice for study in Great Britain, let alone at King's College or Cambridge, and she was rejected, but she refused to quit or return home. She studied on her own, improved her English, and was eventually admitted to King's College of London in 1991, where she earned a Bachelor of Science Degree with honor in 1995. Exhibit 1.

11. This was the springboard for entry into Cambridge University in 1995, where Ms. Sindi earned a Ph.D. in Biotechnology in 2001 (see Exhibit 2), making her the first Saudi Arabian woman to attain such a degree. Although she had been turned down by Oxford when she first landed in Great Britain, she earned a certificate in Molecular Medicine from Oxford while she was a Cambridge doctoral student in 1999. Exhibit 3. After her graduation, she received a prestigious visiting scholar position at Harvard University in the laboratory of Professor George Whitesides, and continued her work within Professor Whitesides' prestigious laboratory thereafter.

12. Ms. Sindi has dedicated her life's work and her science to the service of society. Not content to remain solely in the academic laboratory, she has always been determined to place her knowledge at the disposal of the disadvantaged in underdeveloped parts of the world. Her second company is a non-governmental organization, Diagnostics for All, which developed a simple device the size of a thumbnail that can provide low-cost

4

diagnostic solutions for the rapid detection of liver, kidney, and metabolic diseases for doctors who must operate in locations without access to "first-world" medicine, hospitals, or laboratories.

13. Among other inventions to her credit, Ms. Sindi is listed as the inventor on a U.S. Patents held jointly with 10 others from Professor Whitesides' Harvard laboratory, dated December 3, 2009. Exhibit 4. She is the sole inventor of another patent in the United States dated June 22, 2010. Exhibit 5. And she has patented another device under the International Patent Cooperation Treaty with the World Intellectual Property Organization ("International Patent") and in Canada, dated September 22, 2003. Exhibit 6. She also is listed as the co-inventor on an International Patent published April 24, 2008. Exhibit 7.

14. Ms. Sindi founded Sonoptix Co, LLC, in the United Kingdom. In May 2012 Sonoptix conducted an Initial Public Offering of its units under the sponsorship of HAYKALAH Financial Advisory, based in Jeddah-Saudi Arabia and raised $20,000,000.

15. As noted above, Ms. Sindi is the co-founder of Diagnostics for All ("DFA"). A business plan for DFA co-authored by Ms. Sindi and five others won the Harvard Business School 12th Annual Business Plan Contest in April 2008. Exhibit 8. The same team won a similar M.I.T. competition for a prize of $100,000, and became the first team to win both competitions in the same year. In November 2012, the Bill & Melinda Gates Foundation awarded DFA a $2.6M grant to develop novel diagnostic tools for the assessment of immunity against tetanus and measles and to support vaccination efforts.

16. Ms. Sindi also founded, serves as C.E.O., and is the guiding force behind the i2 Institute for Imagination and Ingenuity ("i2 Institute"), launched in November 2012 in Jeddah,

Saudi Arabia. The i2 Institute is a non-profit organization that seeks to create an ecosystem of entrepreneurship and social innovation for scientists, technologists, and engineers in the Middle East. This year it will award a dozen aspiring inventors and entrepreneurs fellowships worth over $5,000,000 to encourage economic development in the Middle East.

b. **Samia El-Moslimany and Ann El-Moslimany's Campaign of Slander, Defamation, and Libel against Hayat Sindi**

17. Fouad Dehlawi ("Mr. Dehlawi") is an information-technology specialist, who now lives and works in Jeddah, Saudi Arabia and is a retired associate professor of the Department of Engineering of King Abdul Aziz University in Saudi Arabia. He now works as an Independent Computer & Network Security Professional Advisor. In 2010, Mr. Dehlawi was married to Samia El-Moslimany. Ann El-Moslimany is Samia's mother, Mr. Dehlawi's mother-in-law.

18. Ms. Sindi met Mr. Dehlawi in the course of their common professional endeavors. In November 2010, Ms. Sindi was a visiting scholar at Harvard University, and she was invited to visit his family in Seattle, Washington for the Thanksgiving holiday. Ms. Sindi spent the Thanksgiving holiday with Mr. Dehlawi and Samia El-Moslimany. She met Ann El-Moslimany at this time.

19. In the middle of January 2011, Mr. Dehlawi informed Ms. Sindi that he had been having marital problems and was planning on a divorce. Mr. Dehlawi expressed interest in Ms. Sindi, but the two never had a physical relationship. They continue to interact as professionals in various business and consulting endeavors for organizations of the Saudi government, among others.

6

20. Over the course of 2011, Samia El-Moslimany became enraged and jealous at the thought that her husband had a romantic engagement with Ms. Sindi.  Although Mr. Dehlawi and Ms. Sindi had never had a physical relationship, Samia El-Moslimany's erroneous conjecture about this launched her and her mother's relentless campaign of defamation.

21. Ms. El-Moslimany's tortious campaign began in September 2011 when she began sending Ms. Sindi insulting and aggressive emails..

22. On or around October 17, 2011, Ms. Sindi traveled to Camden, Maine to attend the PopTech Conference to announce the launch of the i2 Institute.  While there, she learned that Samia El-Moslimany had sent her son, Zakaria, to spy on his father and Ms. Sindi. The presence of Zakaria alone made Ms. Sindi anxious and apprehensive, although he did not speak to her directly at the PopTech Conference.

23. Abusive private emails directed to Ms. Sindi from Ms. El-Moslimany quickly escalated into repeated, published false and defamatory statements to third parties.  Samia El-Moslimany and her mother Ann El-Moslimany began to relentlessly pursue Ms. Sindi on the Internet as well as in person at conferences and events attended by Ms. Sindi.

24. Most recently, Samia and Ann El-Moslimany attacked Ms. Sindi with false and defamatory libel in the webpages of the *Washington Post* after reporter David Ignatius wrote an article featuring the life and achievements of Ms. Sindi on January 18, 2011, titled "Newfound status for Saudi women," *Washington Post*, Jan. 18, 2013, avail. at http://www.washingtonpost.com/opinions/david-ignatius-women-gain-newfound-stature-in-saudi-arabia/2013/01/18/9bb67c2e-610e-11e2-9940-6fc488f3fecd_story.html.

25. Using pseudonyms "Her fiancé's wife" and "Cambridge University researcher," Samia El-Moslimany again pursued her baseless, aggressive campaign of slander, defamation,

and libel in the "comment section" of the *Washington Post's* website, where she published malicious falsehoods below Mr. Ignatius' article. The Defendants' defamatory postings direct contravened the *Washington Post's* rules for commenters (see http://www.washingtonpost.com/discussion-and-submission-guidelines/2011/11/21/gIQAuvIbiN_story.html).

26. As "Her fiancé's wife," Samia El-Moslimany posted the following statement: "I am not anonymous. My name is Samia El-Moslimany"; in other comments, she accused Ms. Sindi of an "aggressive assault on my family," and claims to "have collected hundreds of pages of documentation and support for everything that has been mentioned by others below."

27. The defamatory statements set forth by Samia and Ann El-Moslimany have become a stock litany of their malicious campaign to ruin Ms. Sindi's professional career and reputation. These include, without limitation,

    i.    that Ms. Sindi bought and/or plagiarized her Cambridge degree rather than earned it ("Get a PhD is not hard of [sic.] you pay for it");

    ii.    that Ms. Sindi committed unspecified "unethical actions" in connection with her entrepreneurial and business enterprises;

    iii.    that Ms. Sindi is a "fraud" and "con artist";

    iv.    that "[i]t is a lie that Sindi set up two companies and helped run a third" because "[s]he set up Sonoptix in the UK which did research for 1 year before funding dried up and she failed to raise anymore money";

    v.    that Ms. Sinid is "lying" that she helped set up the company Nanoterra.

    vi.    that "[Ms.] Sindi plagarised [sic.] her PhD thesis. Ask Adrian Stevenson who wrote it for her. It was common knowledge in her research lab in Cambridge that she paid Adrian to do that. Adrian, by the way, never paid taxes for his 'services' to Sindi."

8

Samia El-Moslimany also urged the *Washington Post's* readers to "[s]peak to Professor Whitesides of Harvard, and ask about her [Ms. Sindi's] non-existent role in the founding of DFA [Diagnostics for All]." A true and accurate copy of the text of these comments, in the stream of commentary on the David Ignatius article is attached here as Exhibit 9.

28. Each of these statements is false and defamatory.

29. For example, Ms. Sindi has served as Vice Chairman of Nanoterra, a high-technology science and engineering firm.

30. By way of another example, one particularly outrageous statement accuses Ms. Sindi of having paid money to Dr. Adrian Stevenson, a Senior Researcher at Cambridge University, to write (unspecified) portions of her dissertation. Dr. Stevenson has made clear that this claim is outrageous and false, and that the believes Samia El-Moslimany's libel to be a "work of fiction." Dr. Stevenson denies having written Ms. Sindi's dissertation for her or receiving payment to do so.

31. Defendants' actions in the comment section of the *Washington Post* are merely the latest iterations of the El-Moslimany's campaign. On October 21, 2011, Abigail Pesta of the *Daily Beast* authored a feature article about Ms. Sindi titled "Rebel with a Cause" in the "Women in the World" section, which highlighted Ms. Sindi's career achievements and the launch of the i2 Institute. The *Daily Beast* is an American news reporting and opinion website founded and published by the former editor of *Vanity Fair* and *The New Yorker*. Ms. Pesta's article is located on the Internet at http://www.thedailybeast.com/articles/2011/10/21/women-in-the-world-saudi-innovator-hayat-sindi-s-science-breakthrough.html

32. In response to the *Daily Beast* article featuring Ms. Sindi's achievemetns, Samia and Ann El-Moslimany began to post numerous malicious and false statements in the "comment" section adjacent to the article. Their postings include, among other outrageous falsehoods, the assertion that Ms. Sindi was a "fake," a "hypocrite," an "egoistic personality," and a "disgrace." The El-Moslimany's falsely declared as fact that Ms. Sindi lied about her age in order to make herself seem younger than she is and that she was a woman "hiding the true nature of herself in the guise of religion," essentially accusing her of being a fraud. Samia El-Moslimany furthered this claim by stating as a fact that "she [Ms. Sindi] is not who she claims to be." Samia and Ann El-Moslimany hid behind the anonymity made possible by the Internet by assuming the pseudonyms "TruthSeeker," "Munafika," "Rooza," and "Tia."

33. Not only have the El-Moslimanys spread false and defamatory statements about Ms. Sindi, they have demonstrated that they will stop at nothing to perpetuate them through any media available to them. By way of example only, when the journalist Abigail Pesta and the website manager of the *Daily Beast* noticed that the anonymous postings of the El-Moslimany's were false and harassing, the *Daily Beast* removed them in accord with its website policies.

34. Undeterred, on or around October 27, 2011, Samia El-Moslimany re-posted all the defamatory commentary from the *Daily Beast* website on her own Facebook page, a posting that Samia El-Moslimany maintains today. Exhibit 10. Samia El-Moslimany has also posted to her own "wall" on Facebook: "Samia El-Moslimany Hayat Sindi Daily Beast UNCENSORED COMMENTS https://www.facebook.com/media/set/?set=a.10150345180322991.349720.536247990&t

10

ype=1&l=661a4e56c4,which is the URL link to Exhibit 10.  It is therefore clear that
Samia El-Moslimany and her mother are the authors of these published statements.

35. Throughout the winter of 2011, Samia El-Moslimany continued to send hateful,
vindictive emails to Ms. Sindi directly, adopting some of the same pseudonyms that she
and her mother had used in the *Daily Beast* comments.  For example, on December 17,
2011 at 6:41 AM, Samia El-Moslimany sent an email from
"munafikasindi@yahoo.com," in which she vowed that Ms. Sindi would "rue the day"
that she ever encountered Samia El-Moslimany, and she began to refer to Ms. Sindi as
"Sin."

36. Samia El-Moslimany also announced her malicious intent to ruin Ms. Sindi, to damage
permanently her reputation and career, and to pursue this defamatory campaign without
end, saying "Don't think that … I will now go away … I am here forever."  Samia El-
Moslimany then falsely represented her defamatory campaign as based upon "the truth"
and unambiguously expressed the intent to interfere with Ms. Sindi's "business
associates" and, in short, anyone who had or has anything to do with Ms. Sindi.

37. Ms. Sindi received malicious electronic communications either from Samia or Ann El-
Moslimany on a routine basis during 2011 and 2012, which were designed and intended
to harass, intimidate, and inflict emotional distress upon Ms. Sindi.  By way of an
additional example only, on or around December 21, 2011, Samia El-Moslimany began
to bombard Ms. Sindi with extremely long text messages, one of which stated:

> Obviously you are a liar of pathological proportions to the extent that even
> you believe your own petty lies.  However, soon very soon, you will be
> exposed for the hypocrite & fraud that you are ... how does it feel to have
> so screwed up your life?  And you thought you were untouchable...nope!
> Nighty-night!"

11

38. Samia El-Moslimany has done everything in her power to make good on her vicious threats. Not content with jealous personal attacks on Ms. Sindi for some kind of perceived personal relationship with Mr. Dehlawi, Samia El-Moslimany repeatedly posted statements on Facebook that she knew to be false, or, through the exercise of reasonable diligence would have known to be untrue. By way of example only, Ms. El-Moslimany's false statements in this regard include, without limitation, published statements that Ms. Sindi's "achievements are not her own or even fabrications" (Facebook posting of January 24, 2012). Samia El-Moslimany has even gone so far as to state that her falsehoods are based upon "reliable sources" and "hundreds" of pages of documentary evidence. But it is Samia and Ann El-Moslimany who have fabricated malicious untruths, and they have no source of information. They have merely made these additional false statements to lend credibility to their malicious acts of slander and libel.

39. Not only do the El-Moslimanys lack any "reliable sources" for their statements about Ms. Sindi; plentiful information that is publicly available proves that their statements are fabrications. By way of example only, contrary to the Defendants' statements that Ms. Sindi has misrepresented her status as the inventor of various patents, public records show that Ms. Sindi has patented the technology that forms the basis for DFA and Sonoptix, either as sole inventor or as co-inventor with others. See Exhibits 4-7. Her work and accomplishments have not only been endorsed by the most prestigious academic research universities in the world (Harvard, M.I.T., Cambridge); she has also received numerous awards for her work and for her visionary ideas.

12

40. For example, in support of Ms. Sindi's nomination for the L'Oreal UNESCO Award for Women in Science in 2013, Dr. Adrian Stevenson, Senior Research Associate at the Cambridge Institute of Biotechnology wrote, "Over my experience in academia and business, I have not met anyone comparable." A true and accurate copy of Dr. Stevenson's letter is attached to this Complaint as Exhibit 11.

41. Dr. Stevenson mentioned not only Ms. Sindi's credentials, but also the quality of her work in depth. He described her research as "ground breaking" for her Ph.D. and highlighted her publication in Analytical Chemistry, a "top ranking research journal," which is publically available. Id. Ms. Sindi was first author on the article A Strategy for Chemical Sensing Based on Frequency Tunable Acoustic Devices, 73 Anal. Chem., 1577 (2001). Dr. Stevenson said that Ms. Sindi's work for DFA "captures a way of doing science that targets a social problem to be solved." Id. He also stated that her patents, which have been assigned to her company Sonoptix, LLC, are listed by "patentgenius," the leading hub for public patent information used by patent attorneys, companies, investors, scientists, and engineers. Id. In Mr. Stevenson's words, these inventions and Ms. Sindi's contributions to others with her colleagues "give a mind-blowing new technology for the 21st century." Id.

42. Thus Samia and Ann El-Moslimany have set forth their campaign of false and malicious defamation contrary to every truth known about Ms. Sindi, much of which is readily accessible in the public record just as Dr. Stevenson notes in his letter to UNESCO.

43. Samia El-Moslimany has also begun to refer to her campaign of slander, libel, and defamation as "operation arabian [sic.] EXPOSURE" (emp. in orig., Facebook post of December 16, 2012), further evincing her malicious intent. Samia El-Moslimany also

13

stated on Facebook, "Nothing I am posting is not true. I have documents that I can post to prove my statements" (Facebook posting of February 15, 2012). In fact, the El-Moslimanys have no documents to "prove [their] statements" because their statements are based upon malicious fabrications. The Defendants' false statements have been repeatedly published to third parties in writing, orally, and through electronic means, particularly via the Internet.

44. Not content with Internet venues, Samia El-Moslimany and her mother Ann El-Moslimany took their campaign to a new level by appearing in person to slander Ms. Sindi's reputation in public at conferences and business events at which Ms. Sindi spoke and solicited investors. One example was the Conference of the Council for the Advancement of Muslim Professionals ("CAMP") held at the Wyndham Princeton Forrestal Hotel held in Princeton, New Jersey on or around April 4, 2012.

45. Samia and Ann El-Moslimany arranged to stay at the Wyndham Princeton Forrestal Hotel and Conference Center and attempted to enroll in the conference. Alerted to Samia El-Moslimany's attempts to defame and slander Ms. Sindi, the conference organizers withdrew Samia El-Moslimany's registration, but Samia El-Moslimany and Ann El-Moslimany attended nonetheless in order to distribute leaflets to participants of the conference. Enlisting the aid of unknown associates, the El-Moslimanys spread out three large banners with false and defamatory statements about Ms. Sindi, one so large that it had to be held by two individuals. The banners stated, in essence, that Ms. Sindi was a fraud and directed onlookers to their website-blog, TrueHayatSindi.BlogSpot.com. The El-Moslimanys erected one banner at the Wyndham Hotel car park entrance, another at the entrance to the conference hall, and another on the grass in front of the hotel. When

14

Ann El-Moslimany attempted to disrupt activities inside the conference hall, she was twice escorted from the building, which she tried to evade by hiding in the women's bathroom.

46. That day, Samia El-Moslimany congratulated herself for her defamatory "operation arabian [sic.] EXPOSURE" by posting to Facebook at 8:28 PM, "mission accomplished alHamdullillah!"

47. On or around April 21, 2012, Samia El-Moslimany also wrote to the organizers of CAMP to impugn Ms. Sindi's professional qualifications and reputation:

> … her [Ms. Sindi's] personal, professional and academic resume calls into question her credentials as a scholar and a professional. What might seem as trivial dishonesty or vanity about her age, has given her opportunities that should have gone to those who actually fit the "youth" criteria for specific awards. For example, at 40 years of age, Sindi was awarded the 2007 Arab-American Science and Technology Young Professional Award: which "recognizes the early career achievements of a young Arab or Arab-American scientist or technologist." At 42 years Sindi was granted the 2009 PopTech Social Innovation Fellowship: for "high potential young leaders." And at 43 years she was awarded a 2011 National Geographic Emerging Scholar Award: which "supports uniquely gifted and inspiring young adventurers, scientists, photographers, and storytellers—explorers who are already making a difference early in their careers." By misrepresenting her age, Sindi robbed opportunities for recognition, public relations support, funding opportunities and career advancement, from the very youth she proclaims to support with her new institute, http://i2institute.org. Again, not the actions of a true role model, not the least a Muslim one.
>
> Secondly, professionally, Dr. Sindi promotes herself as one of the "one of the [sic.] world's leading biotechnologists" and her company Sonoptix Technology, "a UK company established with Saudi seed money" as developing clinical diagnostics tools for the detection of cancer. According to online sources, Dr. Sindi is the only director, and perhaps only employee of Sonoptix, the company is housed in a storefront in Cambridge, UK, and has not ever produced, marketed or sold any product. For the records available online (http://company-director-check.co.uk/director/909517346) Sonoptix has a total capital of £1000 UK, and has had no financial activity whatsoever since 2007. These are just a couple of the inconsistencies in Dr. Sindi's professional resume.

15

48. Each of these statements is false and knowingly so.  Once again, Samia El-Moslimany demonstrated an apparent fixation on Ms. Sindi's age, but she went far beyond this, suggesting that Ms. Sindi's entire career is fraudulent and that Ms. Sindi has "robbed opportunities for recognition, public relations support, funding opportunities and career advancement" from other scientists and entrepreneurs.  Samia El-Moslimany also accused Ms. Sindi of operating Sonoptix as a fraudulent corporation, although Sonoptix held an initial public offering in May 2012 and has currently raised 20,000,000 in capital.

49. On April 4, 2012, Samia El-Moslimany announced on her Facebook page that she was in or around Needham, Massachusetts.  At that same time, Ms. Sindi began receiving numerous harassing telephone calls from her.  Ms. Sindi also noticed that Samia El-Moslimany was literally following her around and speaking directly to neighbors near her residence.  In these interactions, Ms. El-Moslimany defamed Ms. Sindi by perpetuating the same falsehoods she had published in the past by falsely contending that Ms. Sindi was a fraud, among other slanderous statements.  When Ms. Sindi was walking at night, a Somali man emerged from a shop, recognized her, and stopped her on the street in order to warn her in a threatening voice, "You better be careful sister!" clearly indicating that Samia El-Moslimany had interacted with him and spread vicious lies about Ms. Sindi. Because of Samia El-Moslimany's activities in this regard, Ms. Sindi no longer feels safe, even in her very neighborhood.

50. Uninformed individuals who read, hear, or receive Samia El-Moslimany's various defamatory publications have frequently exhibited violent and/or abusive responses, demonstrating that they believe the Defendants' false and malicious statements.  One commenter to Samia El Moslimany's Facebook page stated on February 16, 2012 that

16

Ms. Sindi was a "Wench"; another said on February 23, 2012, that she "could find herself in the street being stoned or jailed…" A commenter on Samia El-Moslimany's blog, which she maintains at TrueHayatSindi.BlogSpot.com, posted on March 7, 2012, "Haram! InshaAllah justice will be served!"

51. These and other false statements have irreparably damaged Ms. Sindi's reputation and have justifiably caused her to fear for her physical safety as well as caused her extreme emotional duress.

52. Between April 27 – 29, 2012 in Washington, D.C., Ms. Sindi attended the Nifty Fifty Conference, which promotes interest in science and engineering among middle- and high-school students as part of the U.S.A. Science and Engineering Festival. Ms. Sindi was selected by the Festival's organizers from hundreds of applicants for her ability to convey the importance of science to young audiences and to the non-scientific public. Ms. Sindi participated along with ninety-nine other scientists, engineers, high-technology entrepreneurs and financiers, policy makers, actors, journalists, educators, researchers, explorers, storm chasers, video game developers, astronauts, and brain surgeons, among others – all according to the Festival's press release.

53. Samia El-Moslimany attended this event and once again distributed leaflets to attendees. This time, the leaflets bore a caricature of Ms. Sindi beside the statement,

> **A Nifty-Fifty Muslim Woman Scientist?**
>
> She's building, not breaking barriers for my Muslim Daughter!
>
> **LOOK for the TRUTH!**
>
> True**Hayat**Sindi.BlogSpot.com

Exhibit 12.

17

54. The leaflet referred individuals to a blog maintained by Samia El-Moslimany, located on the Internet at the URL address given on the flyer, truehayatsindi.blogspot.com. Defendants use this blog to further perpetuate their false and malicious campaign of defamation against Ms. Sindi. Although Defendants maintain the blog under the pseudonym "Truth Teller," it is perfectly clear who the "anonymous" bloggers are from the statement: "I am an anonymous 3rd party that desires justice to be done and the truth to be told about Fuad Dahlawi [sic.] and Hayat Sindi."

55. The El-Moslimany's continue to post false statements on TrueHayatSindi.BlogSpot.com through today. In reality, virtually nothing set forth on the TrueHayatSindi blog is true and all of the postings are designed and intended to injure Ms. Sindi. To the extent that the so-called "TrueHayatSindiBlog" is not merely preoccupied with Samia El-Moslimany's averments as a jealous wife, the defamatory statements set forth on the website include, without limitation, re-posting the letter, verbatim, that Samia El-Moslimany sent to the organizers of CAMP on April 21, 2012 (referenced in ¶ 47 above). A true and accurate copy of all current postings of this blog as of the date of filing is attached as Exhibit 13.

56. In numerous email chains published to third parties, on Facebook, Internet postings, and in other media, Samia El-Moslimany and her mother Ann El-Moslimany have repeatedly set forth lies about Ms. Sindi.

57. For example, in and around December 22, 2012, Ann El-Moslimany sent defamatory emails to the board members of the i2 Institute. The false and defamatory statements of fact which she sent in her message included the usual litany of slanderous, malicious

18

falsehoods that the El-Moslimany's had been propagating incessantly for over a year, stating, without limitation, that

     i.  Ms. Sindi is an "academic fraud";

     ii.  Ms. Sindi's Ph.D. research and dissertation were actually the work of Dr. Adrian Stevenson;

     iii.  although Ms. Sindi was a visiting Scholar at Harvard University in the laboratory of Professor George Whitesides, she did not teach, do any research of substance, work in his laboratory, or pursue any meaningful work;

     iv.  Ms. Sindi holds herself out as younger than she is so as to qualify for awards for "young" professionals;

     v.  Ms. Sindi is not the actual inventor of technology that she claims to have invented;

     vi.  that Sonoptix is a "fraudulent company"; and

     vii.  Ms. Sindi claims association with companies with which she has no association, including Nanoterra, among others.

A true and accurate copy of this email, as forwarded to an associate of the i2 Institute, Daniel Camara, is attached as Exhibit 14.

58. This is yet another example of the El-Moslimany's relentless efforts to undermine Ms. Sindi's reputation as a professional scientist and entrepreneur, although they are fully aware that Ms. Sindi has founded or co-founded three businesses and/or non-profit companies, won awards from M.I.T. and Harvard Business School for doing so, and served as vice chairman of Nanoterra.

59. The El-Molsminays also persistently attack Ms. Sindi for allegedly lying to say she is younger than she is. But this is, in fact, blatantly false and known to be so by the El-Moslimanys because the question of Ms. Sindi's age is another remarkable facet of her life story.

19

60. Ms. Sindi's United States resident Visa lists her birthdate as November 6, 1967. This is the date that Ms. Sindi always gives when asked for official purposes, but the precise date of her birth is not known to her.

61. This is because it was and still is common in the society into which Ms. Sindi was born for parents to present their children as **_older_** than they actually are. Her parents, though of extremely modest means, wanted their daughter to advance and become an educated woman, despite the fact that roughly 98% of Saudi women were illiterate at the time of Ms. Sindi's birth. It was and is usual and customary for Saudi Arabian parents with aspirations to hold their children out **_as older_** in an effort to open doors to a desirable school or to a desirable job.

62. When Ms. Sindi was a young girl her father wished for her to be admitted to School Number Eight in Riyadh. However, the minimum age of admittance for this school was nine years old, but she was only approximately five years old. She was tall as a little girl, however, and School Number Eight admitted her. At no point, however, did Ms. Sindi's mother or father or Ms. Sindi herself ever represent that she was younger than she was because that would risk cutting her off from opportunities.

63. Spreading the rumor that Ms. Sindi attempts to hold herself out as younger than she is, when, in fact, the circumstances of her life have required her to hold herself out as **_older_** is another example of the kind of base, malicious falsehoods spread by the El-Moslimanys.

c. **Harm Suffered by Hayat Sindi**

64. The damage suffered to date by Ms. Sindi arising from the Defendants' relentless campaign is nearly incalculable given the length, scope, and breadth of the misconduct. There are however examples of direct and tangible impact upon Ms. Sindi caused by

20

Defendants' tortious misconduct. By way of example only, in and around the early part of 2011, Ms. Sindi entered into a contract with Kube Publishing, Ltd. for the rights to publish a biography of her life's story.

65. On July 3, 2012, specifically referring to defamatory statements made by Samia El-Moslimany and Ann El-Moslimany, Kube Publishing, Ltd. informed Ms. Sindi that it was no longer planning to release the book and told her that the press was "waiting for some answers."

66. Samia El-Moslimany and Ann El-Moslimany's malicious campaign has also interfered with Ms. Sindi's businesses and charitable work.

67. Given Ms. Sindi's duties as a board member of the DFA as well as founder and C.E.O. of the i2 Institute and Sonoptix, she is constantly in contact with investors, venture capitalists, and philanthropic institutions. In short, one of Ms. Sindi's core responsibilities is to raise money, an activity that depends crucially upon her reputation as an entrepreneur and scientist as well as a woman of character.

68. Because of what Samia and Ann El-Moslimany have charactized as "operation arabian [sic.] EXPOSURE," investors have told Ms. Sindi that they will not invest money in the i2 Institute, among other projects. Even investors who have continued to support Ms. Sindi's various enterprises have demanded an explanation for the vicious, false statements published and spread by the El-Moslimanys. Ms. Sindi has had to expend great effort to convince her investors that the defamatory statements published by the El-Moslimany's are not true.

69. By way of one example only, the defamatory messages propagated by Samia and Ann El-Moslimany were also sent to i2 Institute board members in the guise of an email from the

21

famous Egyptian Muslim activist and television preacher Amr Khaled, although he is a personal friend of Ms. Sindi's, knows her character, and would never send such a fabricated lie. The email sent to a board member of the i2 Institute announced, "There are allegations about Dr. Sindi plagiarizing her PhD thesis by getting a postdoc to write it on her behalf while she was at Cambridge, UK." A true and accurate copy of this fraudulent email, which the Defendants were behind, is attached as Exhibit 15.

70. Although Ms. Sindi, her co-workers, and associates of the i2 Institute did everything in their power to counter Samia and Ann El-Moslimany's vicious, slanderous libel with the truth, they could not protect the i2 Institute when investors and speakers began to withdraw their participation. An example is, Fadi Ghandor; C.E.O. of the global logistics and delivery corporation Aramex, who refused to either fund the i2 Institute or attend a planned donors event that he had agreed to chair before receiving misinformation spread maliciously by the El-Moslimany's. See Exhibit 16. The loss of funds for the i2 Institutes is nearly incalculable. The planned event had to be canceled after Mr. Fadi withdrew. Ms. Sindi had targeted raising $10,000,000, but the El-Moslimany's interference prevented her from raising a single dollar.

71. Ms. Sindi has also been harmed among other patrons the i2 Institute in other ways. She carefully cultivated a business relationship to the MIT Medial Lab, and it took her the better part of a year to convince the Media Lab to accept fellows at MIT from the i2 Institute.

72. Samia and Ann El-Molsimany interfered with this relationship by sending the Media Lab defamatory emails. Thereafter, representatives of the Media Lab began to cancel meetings with Ms. Sindi, and Ms. Sindi learned that representatives of the Media Lab

22

have been forwarding the El-Moslminays' libelous emails to investors and influential business associates, in particular to Fadi Ghandor, who canceled his cooperation with Ms. Sindi and his fundraising efforts on behalf of the i2 Institute.

73. The need to constantly counter the El-Moslimanys' incessant campaign of defamation has caused Ms. Sindi to suffer a degradation in her physical condition and mental health because she lives in constant fear and anxiety that the El-Moslimanys themselves or someone they may incite will take some form of reprisal action against her or mount some kind of violent attack upon her person.

### Count I
### Defamation, Libel, and Slander

74. Ms. Sindi sets forth here all foregoing paragraphs as if fully stated herein.

75. Samia El-Moslimany and Ann El-Moslimany have engaged in a campaign of libel and slander, which they have styled "operation arabian [sic.] EXPOSURE," in which they have repeatedly published statements on the internet in the comments sections of media articles, on Facebook, and on the blog TrueHayatSindi.BlogSpot.com, among other venues.

76. Samia El-Moslimany and Ann El-Moslimany's campaign of slander has involved their repeated appearance at venues in which Ms. Sindi was engaged to speak to investors, scientists, engineers, or students and distributed leaflets with caricatures of Ms. Sindi that direct recipients to go to the blog TrueHayatSindi.BlogSpot.com.

77. Even when media such as the *Daily Beast* have taken down the Moslimanys defamatory publications, Samia El-Moslimany has republished the offensive statements on her own Facebook page or on her blog.

23

78. Samia El-Moslimany and Ann El-Moslimany have also published each of the false statements identified above to others in person, over email, and via other electronic means, and through writings such as flyers.

79. Samia El-Moslimany and Ann El-Moslimany's statements were false and were made negligently, intentionally, and/or with reckless disregard for the truth or falsity of such statements.

80. The El-Moslimany's published, false statements of and concerning Ms. Sindi have held her up to scorn, hatred, ridicule, and contempt in the minds of recipients and readers of the statements including but not limited to *Washington Post* readers, the *Daily Beast* readers as well as those who have attended the CAMP conference, the Nifty-Fifty Conference of the U.S.A. Science and Engineering Festival, and other venues where Ms. Sindi appeared to speak and recruit investors for the i2 Institute.

81. As evinced by her own direct emails to Ms. Sindi and her related self-congratulatory comments,, Samia El-Moslimany has acted negligently and/or with  actual malice; Samia Moslimany has acted with reckless and wonton disregard of the truth; and she has acted with the intent to ruin Ms. Sindi's reputation.

82. The defamatory statements published by Samia El-Moslimany and Ann El-Moslimany have damaged Ms. Sindi both in her personal and professional reputation and economically.  Among other things, Ms. Sindi has lost business opportunities with investors and with her publishing house because of the El-Moslimanys.  Ms. Sindi has suffered damage to her reputation generally as well as other economic damage and has suffered  emotional distress arising from the defamatory conduct.

24

## Count II
### Tortious Interference with Contractual Relationships

83. Ms. Sindi sets forth here all foregoing paragraphs as if fully stated herein.

84. Ms. Sindi had a contract with, without limitation, Kube Publishing, Ltd. which promised to publish a biography of her life story.

85. Ms. Sindi also has actual business relationships with her investors and other business associates with whom she has interacted.

86. Samia and Ann El-Moslimany knew of these business relationships and intentionally published libelous statements that they knew or should have known would induce Kube Publishing, Ltd., among other parties, to refuse to perform its contractual promise.

87. Samia and Ann El-Moslimany were motivated by malice, with the intent, as they expressed it, to make Ms. Sindi "rue the day" she ever met Samia El-Moslimany. Defendants have expressed the intent to ruin Ms. Sindi's reputation as a business woman, entrepreneur, and scientist.

88. Samia and Ann El-Moslimany have used the improper means of slander, libel, and defamation.

89. Ms. Sindi suffered damages, without limitation, in the delay and cancelation of her book contract.


## Count III
### Tortious Interference with Prospective Business Relationships

90. Ms. Sindi sets forth here all foregoing paragraphs as if fully stated herein.

91. Ms. Sindi has extensive relationships with investors and philanthropists who invest in her many enterprises, including, without limitation, DFA, the i2 Institute, and Sonoptix.  She

25

had the strong probability of future economic benefit from these relationships in the form

of direct investment in her enterprises or donations to her non-profit companies.

92. Ms. Sindi has extensive relationships with individuals in the academic, scientific, and

business community.

93. Samia and Ann El-Moslimany knew of Ms. Sindi's extensive contacts with these

individuals. Defendants also knew that their intentionally published libelous statements

would discourage these individuals from associating with, donating to, investing in, or

otherwise engaging in business, professional, academic, or scientific endeavors with her.

94. Samia and Ann El-Moslimany were motivated by malice, with the intent, as they

expressed it, to make Ms. Sindi "rue the day" she ever met Samia El-Moslimany.

Defendants have expressed their intent to ruin her reputation as a business woman,

entrepreneur, and scientist.

95. Samia and Ann El-Moslimany have used the improper means of slander, libel, and

defamation.

96. Ms. Sindi suffered damages, without limitation, in the delay or cancelation of investors

who refused to conduct business with her or her business entities because of the

defamation campaign of Samia and Ann El-Moslimany.


### Count IV
### Intentional Infliction of Emotional Distress

97. Ms. Sindi sets forth here all foregoing paragraphs as if fully stated herein.

98. By publishing malicious statements in multiple forums, Samia and Ann El-Moslimany

intended to inflict emotional distress upon Ms. Sindi.


26

99. Moreover, in directly harassing and contacting Ms. Sindi over email, telephone, and text message, in appearing at Ms. Sindi's home and at events where she is scheduled to appear, among other actions, Defendants intended to inflict emotional distress upon the Plaintiff.

100. Samia and Ann El-Moslimany knew or should have known that emotional distress was likely to result from their conduct.

101. The actions described above were and are extreme and outrageous conduct.

102. Ms. Sindi has suffered harm due to emotional distress in the form of constant anxiety over her safety, even in her own neighborhood, in which Samia and Ann El-Moslimany have actively incited fellow Muslims to violence against her, with some posting comments that she should be "stoned."

103. Ms. Sindi's emotional distress was so severe and of a nature that no reasonable person could be expected to endure it.

## Count V
## Permanent Injunction

104. Ms. Sindi sets forth here all foregoing paragraphs as if fully stated herein.

105. Ms. Sindi has been irreparably harmed in her reputation and in the reputation of her business enterprises by the malicious campaign of defamation conducted by Samia El-Moslimany and Ann El-Moslimany.

106. Unaware of their patent falsehood and incited by them, recipients of the El-Moslimanys' statements have made threats of violence against Ms. Sindi, suggesting, by way of one example only, that she should be "stoned."

27

107.     This has caused Ms. Sindi to fear for her physical safety and caused her emotional

trauma for which there is and can be no economic compensation.

108.     Samia and Ann El-Moslimany have vowed to set forth their defamatory campaign

at all cost and without end.

109.     In order to halt this malicious campaign of libel, slander, and defamation, Ms.

Sindi has no adequate remedy at law.

110.     Ms. Sindi therefore asks this court to enjoin Samia El-Moslimany and Ann El-

Moslimany from any and all acts of slander, libel, and defamation against her.

## **PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, Plaintiff Hayat Sindi respectfully requests that this COURT

1. Enter judgment on all counts in favor of Ms. Sindi and award her damages in an amount to be determined by jury;

2. Declare that Defendants Samia El-Moslimany and Ann El-Moslimany have engaged in a campaign of slander, libel, and defamation against Ms. Sindi;

3. Enter a permanent injunction ordering Defendants Samia El-Moslimany and Ann El-Moslimany to cease and desist from spreading defamatory and false statements agaisnt Ms. Sindi;

4. Enter a permanent injunction ordering Defendants Samia El-Moslimany and Ann El-Moslimany to cease and desist from appearing at conferences or public events that Ms. Sindi attends in order to distribute libelous leaflets or otherwise engage in slander and libel against Ms. Sindi;

5. Enter a permanent injunction ordering Defendants Samia El-Moslimany and Ann El-Moslimany to cease maintaining the blog "TrueHayatSindi.BlogSpot.com" or any blog with Ms. Sindi as its subject;

6. Enter a permanent injunction ordering Defendants Samia El-Moslimany and Ann El-Moslimany to cease and desist in publication of malicious and false statements about Ms. Sindi in response to articles written about her;

7. Declare that Defendants Samia El-Moslimany and Ann El-Moslimany have tortiously interfered with Ms. Sindi's contractual relations;

8.  Declare that Defendants Samia El-Moslimany and Ann El-Moslimany have tortiously interfered with Ms. Sindi's prospective business relations;

9.  Declare that Defendants Samia El-Moslimany and Ann El-Moslimany have invaded Ms. Sindi's privacy;

10. Declare that Defendants Samia El-Moslimany and Ann El-Moslimany have intentionally inflicted emotional distress upon Ms. Sindi;

11. Grant Plaintiff Ms. Sindi her reasonably attorney's fees and costs; and

12. Award such other relief as the Court deems just and proper.

## JURY DEMAND

HAYAT SINDI CLAIMS A RIGHT TO A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE

29

I HEREBY ATTEST AND CERTIFY ON

May 13, 2013   THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

HAYAT SINDI,

By her attorneys,

David H. Rich (BBO# 634275)
Michael Thad Allen (BBO# 679795)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626
drich@toddweld.com
mallen@toddweld.com

Dated:  January 25, 2012



30

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HAYAT SINDI, | ) |
| | ) |
| Plaintiff, | ) |
| | )        No.: |
| v. | ) |
| | ) |
| SAMIA EL-MOSLIMANY and | ) |
| ANN EL-MOSLIMANY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF REMOVAL BY THE DEFENDANTS, SAMIA EL-MOSLIMANY AND ANN EL-MOSLIMANY

To:     Judges of the United States District Court for the District of Massachusetts:

The defendants, Samia El-Moslimany and Ann El-Moslimany, by their undersigned attorneys, hereby gives notice of their removal of this action, pursuant to 28 U.S.C. §§ 1331, 1332, 1441 & 1446, to the United States District Court for the District of Massachusetts.  As grounds for removal, Defendants state as follows:

## NATURE OF THE ACTION

1.      The plaintiff, Hayat Sindi, filed the initial complaint in this action on January 25, 2013 in the Superior Court for the Commonwealth of Massachusetts, Suffolk County.

2.      Defendant Samia El-Moslimany has not yet been was served with the Summons and Complaint.

3.      Defendant Ann El-Moslimany has not yet been served with the Summons and Complaint.

4.      As alleged in the Complaint, Plaintiff seeks substantial money damages from Defendants claimed knowing, intentional, and malicious campaign of defamation.  (Compl. ¶ 1.)

5.      Plaintiffs assert claims against Defendants for "Defamation, Libel, and Slander" (*id.*, Count I), "Tortious Interference with Contractual Relationships" (*id.*, Count II), "Tortious

Interference with Prospective Business Relationships" (*id.*, Count III), "Intentional Infliction of Emotional Distress" (*id.*, Count IV), and "Permanent Injunction" (*id.*, Count V).

## AMOUNT IN CONTROVERSY

6.      It is apparent from the face of the Complaint and attachments thereto that the amount in controversy, exclusive of interest and costs, in this action presently exceeds $75,000.

7.      Plaintiff alleges that her damages total $10,000,000.00.  In addition, Plaintiff seeks "her reasonable attorney's fees and costs".  (*Id.* Prayer for Relief and Jury Demand).[1]

## PARTIES AND DIVERSITY OF CITIZENSHIP

8.      As alleged in the Complaint, at the time this action was filed and at all times since, Plaintiff was and is a resident of the Commonwealth of Massachusetts.  (Compl. ¶ 2.)

9.      As alleged in the Complaint, at the time this lawsuit was filed and at all times since, both defendant were and are residents of the state of Washington.  (*See id.* ¶¶ 3 and 4.)

10.      Accordingly, there exists complete diversity of citizenship between Plaintiffs and State Farm pursuant to 28 U.S.C. § 1332.

## REMOVAL PROCEDURES

11.      Defendants Samia El-Moslimany and Ann El-Moslimany have not yet been served with the Summons and Complaint.  Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is timely filed within 30 days of first service on Defendants of the Plaintiff's Complaint.  There is no prohibition on filing a Notice of Removal before service of process has been made.

12.      Pursuant to Local Rule 81.1(a), Defendants shall request of the Clerk of the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts in and for the County of Suffolk certified or attested copies of all records, proceedings and docket entries

---

[1]      Defendants do not concede that the Plaintiff would be entitled to any of the relief sought in the Complaint.  Nor do they agree that the underlying claims upon which Plaintiff's causes of action are based may be appropriately asserted in this action.

1354360v1

therein and shall file same with the Court within twenty-eight (28) days after filing this Notice of Removal.

13.    A copy of this Notice of Removal is being filed with the clerk of the Superior Court for the Commonwealth of Massachusetts, Suffolk County, as provided by law.  Written notice of removal is also being given to Plaintiff.

14.    Defendants reserve the right to amend or supplement this Notice of Removal.

15.    If any question arises as to the propriety of the removal of this action, Defendants request the opportunity to present a brief and request oral argument in support of removal.

Dated: April 8, 2013.


THE DEFENDANTS,
SAMIA EL-MOSLIMANY and
ANN EL-MOSLIMANY,
By their attorneys,
MORRISON MAHONEY LLP


*/s/ George R. White*
Mark R. Segalini, BBO No.:   450780
George R. White BBO# 645752
250 Summer Street
Boston, MA  02210
(617) 439-7500
msegalini@morrisonmahoney.com
grwhite@morrisonmahoney.com


## CERTIFICATE OF SERVICE

I hereby certify that, this 8th day of April, 2013, I have electronically filed a copy of the above and foregoing with Clerk of the Court using the ECF system which sent notification of such filing to counsel of record.

/s/ George R. White
George R. White, BBO No. 645752

3

# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HAYAT SINDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.: 1:13-cv-10798-IT |
| v. | ) | |
| | ) | |
| SAMIA EL-MOSLIMANY, and | ) | |
| ANN EL-MOSLIMANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**SPECIAL JURY VERDICT FORM**

Plaintiff's Claim for Defamation Against Samia El-Moslimany

1(a). Do you find that the Plaintiff has proved by a preponderance of the evidence that (i) Samia El-Moslimany published a statement (or statements) of and concerning Dr. Sindi, (ii) that the statement (or statements) about Dr. Sindi were false and defamatory and (iii) the defamatory statement (or statements) either caused Plaintiff economic loss or is of the type that is actionable without proof of economic loss?

Yes ✓      No _____

**If you answered Question 1(a) YES then proceed to Question 1(b).**
**If you answered Question 1(a) NO then proceed to Question 2(a).**

1(b). Do you find by clear and convincing evidence that Samia El-Moslimany published the defamatory statement (or statements) with knowledge that it was false or with reckless disregard of whether it was false or not?

Yes ✓      No _____

**If you answered Question 1(b) YES then proceed to Question 1(c).**
**If you answered Question 1(b) NO then proceed to Question 2(a)**

1(c). What amount of money, if any, will fairly compensate the plaintiff for her injury or damages caused by Samia El-Moslimany defaming the plaintiff?

$ _400,000_____ (write in figures)
_Four hundred thousand dollars_ (write in words)

**Please proceed to Question 2(a).**

<u>Plaintiff's Claim for Intentional Interference with Contractual Relationships</u>
<u>Against Samia El-Moslimany</u>

2(a). Do you find by a preponderance of the evidence that Samia El-Moslimany intentionally
interfered with plaintiff's contractual relationships?

Yes ___✓___    No _____

**If you answered NO to Question 2(a) then proceed to Question 3(a).**
**If you answered YES to Question 2(a) then proceed to Question 2(b).**

2(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a
result of Samia El-Moslimany interfering with the plaintiff's contractual relationships?

Yes ___✓___    No _____

**If you answered NO to Question 2(b) then proceed to Question 3(a).**
**If you answered YES to Question 2(b) then proceed to Question 2(c).**

2(c). What amount of money will fairly compensate the plaintiff for her injuries or damages
which were caused by Samia El-Moslimany's interfering with the plaintiff's contractual
relationships?

$ 2,000,000 _____ (write in figures)

Two million dollars _____ (write in words)

**Please proceed to Question 3(a).**

2

Plaintiff's Claim for Intentional Interference with Prospective Business Relations
Against Samia El-Moslimany

3(a). Do you find by a preponderance of the evidence that Samia El-Moslimany intentionally
interfered with the plaintiff's prospective business relationships?

Yes ✓_____   No _____

**If you answered NO to Question 3(a) then proceed to Question 4(a).**
**If you answered YES to Question 3(a) then proceed to Question 3(b).**

3(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a
result of Samia El-Moslimany interfering with the plaintiff's prospective business
relationships?

Yes ✓_____   No _____

**If you answered NO to Question 3(b) then proceed to Question 4(a).**
**If you answered YES to Question 3(b) then proceed to Question 3(c).**

3(c). What amount of money will fairly compensate the plaintiff for her injuries or damages
which were caused by Samia El-Moslimany interfering with the plaintiff's prospective
business relationships?

$ _400,000_____ (write in figures)

_Four hundred thousand dollars_   (write in words)

**Please proceed to Question 4(a).**

3

<u>Plaintiff's Claim for Intentional Infliction of Emotional Distress Against Samia El-Moslimany</u>

4(a). Do you find by a preponderance of the evidence that Samia El-Moslimany intentionally caused the plaintiff to suffer severe emotional distress?

Yes ___✓___   No _____

**If you answered NO to Question 4(a) then proceed to Question 5(a).**
**If you answered YES to Question 4(a) then proceed to Question 4(b).**

4(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Samia El-Moslimany causing the plaintiff to suffer severe emotional distress?

Yes ___✓___   No _____

**If you answered NO to Question 4(b) then proceed to Question 5(a).**
**If you answered YES to Question 4(b) then proceed to Question 4(c).**

4(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Samia El-Moslimany causing the plaintiff to suffer severe emotional distress?

$ _100,000_____ (write in figures)

_One hundred thousand dollars_ (write in words)

**Please proceed to Question 5(a).**



4

Plaintiff's Claim for Defamation Against Ann El-Moslimany

5(a). Do you find that the Plaintiff has proved by a preponderance of the evidence that (i) Ann El-Moslimany published a statement (or statements) of and concerning Dr. Sindi, (ii) that the statement (or statements) about Dr. Sindi were false and defamatory and (iii) the defamatory statement (or statements) either caused Plaintiff economic loss or is of the type that is actionable without proof of economic loss?

Yes  ✓      No  _____

**If you answered Question 5(a) YES then proceed to Question 5(b).**
**If you answered Question 5(a) NO then proceed to Question 6(a).**

5(b). Do you find by clear and convincing evidence that Ann El-Moslimany published the defamatory statement (or statements) with knowledge that it was false or with reckless disregard of whether it was false or not?

Yes  ✓      No  _____

**If you answered Question 5(b) YES then proceed to Question 5(c).**
**If you answered Question 5(b) NO then proceed to Question 6(a)**

5(c). What amount of money, if any, will fairly compensate the plaintiff for her injury or damages caused by Ann El-Moslimany defaming the plaintiff?

$ _100,000_____ (write in figures)

_One hundred thousand dollars_____ (write in words)

**Please proceed to Question 6(a).**

5

<u>Plaintiff's Claim for Intentional Interference with Contractual Relationships</u>
<u>Against Ann El-Moslimany</u>

6(a). Do you find by a preponderance of the evidence that Ann El-Moslimany intentionally
interfered with plaintiff's contractual relationships?

Yes  ✓      No  _____

**If you answered NO to Question 6(a) then proceed to Question 7(a).**
**If you answered YES to Question 6(a) then proceed to Question 6(b).**

6(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a
result of Ann El-Moslimany interfering with the plaintiff's contractual relationships?

Yes  ✓      No  _____

**If you answered NO to Question 6(b) then proceed to Question 7(a).**
**If you answered YES to Question 6(b) then proceed to Question 6(c).**

6(c). What amount of money will fairly compensate the plaintiff for her injuries or damages
which were caused by Ann El-Moslimany's interfering with the plaintiff's contractual
relationships?

$ 400,000 _____ (write in figures)

Four hundred thousand dollars     (write in words)

**Please proceed to Question 7(a).**

6

Plaintiff's Claim for Intentional Interference with Prospective Business Relations
Against Ann El-Moslimany

7(a). Do you find by a preponderance of the evidence that Ann El-Moslimany intentionally
interfered with the plaintiff's prospective business relationships?

Yes  ✓      No  _____

      **If you answered NO to Question 7(a) then proceed to Question 8(a).**
      **If you answered YES to Question 7(a) then proceed to Question 7(b).**

7(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a
result of Ann El-Moslimany interfering with the plaintiff's prospective business
relationships?

Yes  ✓      No  _____

      **If you answered NO to Question 7(b) then proceed to Question 8(a).**
      **If you answered YES to Question 7(b) then proceed to Question 7(c).**

7(c). What amount of money will fairly compensate the plaintiff for her injuries or damages
which were caused by Ann El-Moslimany interfering with the plaintiff's prospective
business relationships?

$ _100,000_____ (write in figures)

_One hundred thousand dollars_      (write in words)

**Please proceed to Question 8(a).**

7

Plaintiff's Claim for Intentional Infliction of Emotional Distress Against Ann El-Moslimany

8(a). Do you find by a preponderance of the evidence that Ann El-Moslimany intentionally caused the plaintiff to suffer severe emotional distress?

Yes ✓     No _____

**If you answered NO to Question 8(a), you have completed the Verdict Slip.**
**If you answered YES to Question 8(a) then proceed to Question 8(b).**

8(b). Do you find by a preponderance of the evidence that the plaintiff suffered damages as a result of Ann El-Moslimany causing the plaintiff to suffer severe emotional distress?

Yes ~~✗~~     No ✓

**If you answered NO to Question 8(b), you have completed the Verdict Slip.**
**If you answered YES to Question 8(b) then proceed to Question 8(c).**

8(c). What amount of money will fairly compensate the plaintiff for her injuries or damages which were caused by Ann El-Moslimany causing the plaintiff to suffer severe emotional distress?

$ _~~blacked out~~_____ (write in figures)

_____     (write in words)

*The foreperson of the jury should sign this verdict form in the space provided below. The foreperson should then inform the court security officer that the jury has reached a verdict. The foreperson will submit this verdict form to the deputy clerk in open court.*

I certify that the above answers represent the unanimous verdict of the all of the jurors.

_Berard Blumi_____     _7/20/2016_____
Foreperson                          Date

8

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| HAYAT SINDI, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 13-cv-10798-IT** |
| | ) | |
| SAMIA EL-MOSLIMANY and | ) | |
| ANN EL-MOSLIMANY, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION**
**PROHIBITING REPETITION OF DEFAMATORY STATEMENTS**

Plaintiff Hayat Sindi ("Dr. Sindi") hereby moves for a permanent injunction enjoining

Defendants Samia and Ann El-Moslimany from repeating certain defamatory statements of and

concerning Dr. Sindi.   The injunction sought is appropriate where the matters raised through this

motion have been fully adjudicated, where a jury concluded that Defendants were liable for

maliciously publishing a multitude of defamatory statements and where both Defendants testified

under oath that each reserves the right to utter the defamatory statements in the future,

particularly through social media.   As Chief Justice Warren held in 1967, *"[T]he First*

*Amendment does not include an absolute license to destroy lives or careers."*  Curtis Publ'g Co.

v. Butts, 388 U.S. 130, 170 (1967) (Warren, C.J, concurring).   Thus, entering a permanent

injunction to restrain speech which has been adjudicated to be libelous does not run afoul of the

First Amendment.  Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974) ("[T]here is no

constitutional value in false statements of fact.").   In further support of her Motion, Dr. Sindi

files the accompanying Memorandum of Law.

WHEREFORE, for the reasons set forth above and in the accompanying Memorandum, Dr. Sindi respectfully requests that this Court issue an order enjoining Defendants from repeating the statements identified in the accompanying Proposed Order.

HAYAT SINDI,

By Her Attorneys

/s/ Suzanne Elovecky
David H. Rich (BBO# 634275)
drich@toddweld.com
Suzanne M. Elovecky (BBO# 670047)
selovecky@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Dated:  July 27, 2016                            (617) 720-2626

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I, Suzanne Elovecky, certify that on July 27, 2016, counsel for the Plaintiff has conferred with counsel for the Defendant in a good faith attempt to resolve or narrow the issues presented by this motion.  Counsel for the parties have not reached agreement on the relief sought by the Plaintiff in this motion.

/s/ Suzanne Elovecky

## CERTIFICATE OF SERVICE

I, Suzanne Elovecky, hereby certify that this document has been filed through the ECF system, will be sent electronically to the registered participants as identified on the notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

/s/ Suzanne Elovecky
Suzanne Elovecky

Dated:  July 27, 2016

2

# Exhibit 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HAYAT SINDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.: 1:13-cv-10798-IT |
| v. | ) | |
| | ) | |
| SAMIA EL-MOSLIMANY, and | ) | |
| ANN EL-MOSLIMANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION
PROHIBITING REPETITION OF DEFAMATORY STATEMENTS**

Now come the defendants, Samia El-Moslimany and Ann El-Moslimany, and hereby request that this Honorable Court deny Plaintiff's Motion for Permanent Injunction Prohibiting Repetition of Defamatory Statements.  As grounds therefore, the defendants state as follows.

**I.      The Requested Injunctive Relief Would Violate Defendants' Freedom of Speech**

It is axiomatic in this diversity case that the requested permanent injunction cannot be issued if it contravenes either the United States or Massachusetts Constitutions.

**i.      Article 16 of the Massachusetts Declaration of Rights**

Plaintiff's proposed permanent injunction would be in violation of the free speech provisions set forth in Article 16 of the Massachusetts Declaration of Rights.

The Massachusetts Supreme Judicial Court has stated that "[i]t is apparent that the constitutional protections of free speech and public interest in the discussion of many issues greatly limit the area in which the power to give injunctive relief may or should be exercised in defamations cases." Krebiozen Research Foundation v. Beacon Press, Inc., 334 Mass. 86, 93

(1956)(affirming denial of injunction that would have prevented the publication of statements harmful to medical researchers' professional reputations). "[O]ur law thinks it is better to let the defamed person take his damages for what they are worth than to intrust a single judge (or even a jury) with the power to put a sharp check on the spread of possible truth." Krebiozen Research Foundation, 334 Mass. at 95. "[E]ven allegedly false and defamatory statements are protected from prior injunctive restrain by the First Amendment and art. 16" of the Massachusetts Declaration of Rights. Nyer v. Munoz-Mendoza, 385 Mass. 184, 188 (1982), citing Krebiozen.

"Although the Supreme Judicial Court in Krebiozen determined that 'equity has jurisdiction to enjoin libel and slander,' it held that 'whether it is to be exercised … depends … upon all of the relevant circumstances." Shawsheen River Estates Assoc., Ltd. v. Herman 3 Mass. Law Rptr. 475 (April 11, 1995) quoting Krebiozen Research Foundation, 334 Mass. at 93.

Here, where (1) the jury did not identify which statement(s) it found to be defamatory, (2) the statements at issue do not have the effect of force as "verbal acts", (3) the public has an interest in learning the truth about the plaintiff, who is both a public figure and a public official, and (4) the harm created by restraining the defendants' speech is a far greater one than that of possible harm to the plaintiff, which can be cured by a monetary award, the court should deny plaintiff's motion for a permanent injunction. See Nyer, 385 Mass. at 188-189 (holding that permanent injunction that prohibited any communication by defendant by signs or notices of any kind on demised premises owned by plaintiff, except that defendant could post signs or notices within her apartment other than the area visible to public view, violated defendant's constitutional protection of speech). See also Krebiozen Research Foundation, 334 Mass. at 98–99; Clay Corp. v. Colter, 30 Mass.L.Rptr. 536 (Sept. 12, 2012)(denying motion for preliminary injunction against defendants who were conducting a social medial campaign against plaintiffs

on grounds that the defendants "First Amendment right to express their views should not be subject to prior restraint by this Court.  Plaintiffs must resort to money damages for remedy of those harms which they can prove arising from the underlying claims."); Shawsheen River Estates Assoc., Ltd. v. Herman 3 Mass.L.Rptr. 475 (April 11, 1995)(denying motion for injunction to enjoin the speech and activities of defendants who had attempted through leafletting, picketing, posting signs and oral communication to express their concerns regarding the condition of their homes to prospective purchasers of unsold units at development built by plaintiff).

### ii.    First Amendment to the U.S. Constitution

"Even if a plaintiff shows that injunctive relief is appropriate, the injunction must comport with the Constitution." Baker, 95 F.Supp.3d at 58.  The plaintiff's request that the Court issuing an order preventing the defendants from repeating certain allegedly defamatory statements of and concerning the plaintiff raises First Amendment concerns.

A prohibition on writing or publishing is a form of prior restraint.  "A prior restraint is a government regulation that limits or conditions in advance the exercise of protected First Amendment activity.  Baker, 95 F.Supp.3d at 58 quoting Auburn Police Union v. Carpenter, 8 F.3d 886, 903 (1st Cir. 1993).  "[A] judicial injunction that prohibits speech *prior to a determination that the speech is unprotected* [] constitutes a prior restraint." Id.  "Any system of prior restraints of speech 'comes to this Court bearing a heaving presumption against its constitutional validity." Auburn Police Union, 8 F.3d at 903 quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558 (1975); Bantan Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963); New York Times Co. v. United States, 403 U.S. 713, 714 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971).  Prior restraints are "the most serious and the

1448273v.1

least tolerable infringement on First Amendment rights," because they may prevent the dissemination of truthful information. Nebraska Research Ass'n v. Stuart, 427 U.S. 539, 559 (1976). The presumption against the constitutionality of prior restraints is heavier than that against restrictions on speech imposed by subsequent penalties. Auburn Police Union, 8 F.3d at 903 citing Vance v. Universal Amusement Co., 445 U.S. 308, 315-16 (1980); Southeastern Promotions Ltd., 420 U.S. at 558-59; New York Times Co., 403 U.S. at 733. The Supreme Court has explained the basis for this heavy presumption as follows:

> Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few after who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

Auburn Police Union, 8 F.3d at 903 quoting Southeastern Promotions Ltd., 420 U.S. at 559.

"[I]t has long been settled that the publication of a defamation, although actionable, may not be enjoined." Baker, 95 F.Supp.3d at 58 quoting United States v. Doe, 455 F.2d 753, 759 n. 4 (1st Cir. 1972) (vacated on other grounds by Gravel v. United States, 408 U.S. 606 (1972); see also Saad v. Amer. Diabetes Ass'n, 2015 WL 751295 (D. Mass. Feb. 23, 2015) (denying a motion for a preliminary injunction to enjoin defamatory statements). "Aside from the First Amendment's heavy presumption against prior restraints, courts have long held that equity will not enjoin a libel." See Hill v. Petrotech Resources Corp., 325 S.W.3d 302, 306 (2010) citing Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976); Kramer v. Thompson, 947 F.2d 666, 677-78 (3rd Cir. 1991); Community for Creative Non-Violence v. Pierce, 814 F.2d 663, 672 (D.C. Cir. 1987)("The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages."); American Malting Co. v. Keitel, 209 F. 351,

354 (2d Cir. 1913)("Equity will not restrain by injunction the threatened publication of a libel, as such, however great the injury to property may be.  This is the universal rule in the United States…."); Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union, 239 F.3d 172, 177 (2d Cir. 2001); 42 An.Jur.2d, Injunctions, §97 (2010)("The general rule is that equity does not enjoin libel, rather, the only remedy for defamation is an action for damages, and there is a heavy presumption that prior restraints on expression are unconstitutional.").

However, under the emerging "modern rule" that has been adopted by some courts, "[a]n injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint."  Baker, 95 F.Supp.3d at 58 quoting Auburn Police Union, 8 F.3d at 903 (citing Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 390 (1973); and citing Lothschuetz v. Carpenter, 898 F.2d 1200, 1206, 1208-09 (6th Cir. 1990)(stating that, "in view of [the defendant's] frequent and continuing defamatory statements, an injunction is necessary to prevent future injury to [the plaintiff's] personal reputation and business relations" and that any injunction should be "limit[ed] … to the statements which have been found in this and prior proceedings to be false and libelous").

Concerning the application of the modern rule the Supreme Court of California has stated:

> In determining whether an injunction restraining defamation may be issued, therefore, it is crucial to distinguish request for preventive relief prior to trial and post-trial remedies to prevent repetition of statement judicially determined to be defamatory.  As one commentator aptly recognized:  "there are two stages at which it would be in the plaintiff's interest to enjoin publication of a defamation firstly to preclude the initial public distribution, and secondly to bar continued distributions after a matter has been

1448273v.1

adjudged defamatory.  The attempt to enjoin the initial distribution of a defamatory matter meets several barriers, the most impervious being the constitutional prohibition against prior restraints on free speech and press…. In addition, such an injunction may be denied on the grounds that equitable jurisdiction extends only to property rights and not personalty…. In a few states the requirement that criminal libels be tried by a jury has been applied to civil cases as well, thus proving a third objection to the granting of an injunction against the initial distribution of defamatory matter.  *In contract, an injunction against continued distribution of a publication which a jury has determined to be defamatory may be more readily granted.*  The simplest procedure is to add a prayer for injunctive relief to the action for damages ….  Since the constitutional problems of a prior restraint are not present in this situation, and the defendant has not been deprived of a jury determination, injunctions should be available as ancillary relief for … personal and political defamations.

Balboa Island Village Inn, Inc. v. Lemen, 57 Cal.Rptr.3d 320, 333 (2007) quoting 1 Hanson,

Libel and Related Torts (1969) § 170, pp. 139-140.

Significantly, the U.S. Supreme Court has never approved a prior restraint in a

defamation case.  See  Kinney v. Barnes, 443 S.W.3d 87, 94 (2014) citing Erwin Chemerinsky,

Injunctions in Defamation Cases, 57 Syracuse L. Rev. 157, 167  (2007); Near v. Minnesota, 283

U.S. 697, 706 (1931)(invalidating statute allowing courts to enjoin publication of future issues of

newspaper because previous editions were found to be "chiefly devoted to malicious, scandalous

and defamatory articles.").

Here, assuming that the U.S. Supreme Court would find the "modern rule" to be

constitutionally valid – which is an unsettled question, upon application of the "modern rule" to

the circumstances of the present case, this Court need go no further than to note that the speech

that the plaintiff alleges to be false and defamatory has not been adjudicated to be, in fact, false

and defamatory.   Specifically, the jury was not asked to identify which statement(s) it found to

be defamatory and it did not identify which statement(s) it found to be defamatory.  Accordingly,

the court cannot determine which of the numerous statements that the plaintiff alleges to be

1448273v.1

defamatory were found by the jury to be false and libelous, a prerequisite for the entering of a permanent injunction under the modern rule. Therefore, any injunction that prohibits the defendants from repeating any of the statements that the plaintiff alleges to have been defamatory could prohibit speech that is not defamatory and would be an unconstitutional prior restraint. Compare Baker v. Kuritzky, 95 F.Supp.3d 52 (2015)("an order prohibiting [the defendant] from repeating statements which, because of default, must be taken as true and are libelous is constitutionally permissible and appropriate."); Saadi v. Maroun, 2009 WL 3617788 M.D. Fl. Nov. 2, 2009)(business owner entitled to permanent injunction forbidding defendant from republishing statements that jury found to be defamatory); Thermolife Int'l LLC v. Connors, 2014 WL 1050789 (D. N.J. March 17, 2014)(enjoining only the further dissemination of false statements of the kind admitted by defendant's failure to answer complaint); Loden v. Schmidt, 2015 WL 1881240 (Tenn Ct. App. April 24, 2015)(affirming permanent injunction barring defendant from making any untrue or defamatory statements concerning plaintiff or his business entered after default was entered against defendant which resulted in plaintiff's allegation that defendant made repeated false and defamatory statements about plaintiff and his business being admitted as if a trial on the merits had been conducted); Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc., 352 N.W.2d 1, 11 (Minn. 1984)("We therefore hold that the injunction below, limited as it is to material found either libelous or disparaging after a full jury trial, is not unconstitutional and may stand.").

The plaintiff attempts to circumvent the modern rule's requirement of a final adjudication that the statements at issue are defamatory by claiming that it is within the power of this Court to determine the proper scope of the injunction, based on the Court's independent assessment of the evidence. In support of this attempt to deprive the defendants of their right to have a jury

determine which statement(s) were defamatory, the plaintiff cites the case of McCarthy v. Fuller, 810 F.3d, 456, 463 (7th Cir. 2015)("[t]he judge could have based the injunction on his own assessment of the evidence, since the issuance of an injunction is the responsibility of the trial judge rather than of the jury"). The plaintiff, however, fails to acknowledge a critical difference between the instant action and McCarthy. Specifically, in McCarthy, the defendants had failed to make a timely objection to the entry of the injunction. McCarthy, 810 F.3d at 461. In his opinion in McCarthy, Judge Posner wrote:

> [T]he jury was not asked which statements had been made by the defendants and, of those statements, which were defamatory. All it was asked to find and all it did find was that the defendants had defamed the plaintiffs and should be ordered to pay damages … **"[h]ad [the defendants] made a timely objection to the entry of the injunction on the ground that the jury had not indicated what defamatory statements it found the defendants to have made … we would vacate [the permanent injunction] without further ado**."

McCarthy, 810 F.3d at 460-61 (emphasis supplied).

Here, as the party seeking the permanent injunction, the plaintiff had the responsibility to propose a special verdict form that asked the jury to make "statement specific" defamation findings. The plaintiff did not do so. As a result, the Court has no idea which specific statement(s) the jury found to be false and defamatory. Rather, the Court has only the equivalent of a general verdict that the defendants are liable for defamation. Such a verdict does not contain the necessary factual findings to support the issuance of a permanent injunction. Furthermore, as the defendants have made a timely objection to the plaintiff's motion for permanent injunction, it would be inappropriate for the Court to issue an injunction based on its own assessment of the evidence presented at trial, which would deny the defendants their right to have a jury determine which statement(s) at issue were defamatory.

1448273v.1

Further, assuming *arguendo*, that it would be appropriate for the Court to make its own assessment of the evidence, which defendants deny, the defendants offered substantial and compelling evidence that their statements were true or, if false, were not make with knowledge or reckless disregard of their falsity.  For example, concerning the plaintiff's involvement, or lack thereof, with Diagnostics for All, Inc., George Whitesides testified that the plaintiff was not a founder of Diagnostics for All, Inc., she was not an inventor of the diagnostic tool that was being developed by Diagnostics for All, Inc., and the plaintiff was not active in her role as a director at Diagnostics for All, Inc.

Concerning the plaintiff's misrepresentations relating to her personal, professional and academic accomplishments, George Whitesides testified that the plaintiff was not a leading scientist, she did not conduct any research during four of the five years that she held the title of Visiting Scholar at Harvard, the plaintiff was perceived by other directors and officers at Diagnostics for All, Inc. as receiving credit for development of the paper diagnostic device that should have been given to Diagnostics for All, Inc., and there was an effort to remove the plaintiff from Diagnostics for All, Inc.'s board of directors.  Also, Myer Berlow confirmed that he had described the plaintiff as "essentially a fraud".  Further evidence of the plaintiff's propensity to exaggerate her accomplishments was provided by the plaintiff who testified that giving a speech at Harvard or M.I.T. would allow her to use the title of Visiting Professor at those institutions, as well as her claim that she was an alumna of M.I.T. because she had attended a single summer course at that institution, and she had "studied at Oxford" because she took a two-day introductory level professional education class at that institution.  Also, the defendants offered numerous articles and other materials that supported their position that the plaintiff had claimed to have invented MARS and a process to turn sewage into drinking water, that she was a

9

recipient of the Princess Ann Award, and she became a member of the Royal College Teachers at the invitation of Prince Phillip, all of which the plaintiff acknowledged at trial were not true. See, e.g. Tr. Ex. 86 (Hayat Sindi:  Brilliant Biochemist), Tr. Ex. 87 (Hayat Sindi Interview:  A Passion for Science), Tr. Ex. 88 (Hayat Sindi Resume), Tr. Ex. 125 (Your Gateway to Jeddah Newsflash), and Tr. Ex. 144 (Certified Translation of Hayat Sindi Shura Council Biography).

Similarly, the defendants offered evidence that the plaintiff has misrepresented her age, such as her medical records from Canyon Ranch and numerous articles stating that the plaintiff was sixteen-years-old or a teenager when she moved from Saudi Arabia to England, which the plaintiff admitted was not true as she was born in 1967 and did not move to England until 1990. See, e.g. Tr. Ex. 70 (Seminar Notice), Tr. Ex. 87 (Hayat Sindi Interview:  A Passion for Science), Tr. Ex. 107 (Records produced by Canyon Ranch/Teresa Hubkova, M.D.), and Tr. Ex. 126 (UNC Wise Profile:  Hayat Sindi).

Finally, concerning her research work at Cambridge University and her Ph.D. dissertation, Samia El-Moslimany testified that Myer Berlow told her that he did not believe that the plaintiff had the knowledge to write her Ph.D. dissertation, which was consistent with information provided to Samia El-Moslimany by Professor Christopher Lowe, and others who knew the plaintiff while she was at Cambridge University, including Professor Lowe's statement that he believed that the plaintiff's Ph.D. dissertation was written by Adrian Stevenson. Significantly, the plaintiff did not present any testimony from Professor Lowe or Adrian Stevenson to refute Samia El-Moslimany's testimony concerning Professor Lowe's statements.

## II.     The Requested Injunctive Relief is Not Appropriate

In the First Circuit:

> [I]njunctive relief may be ordered where (1) the plaintiff has
> prevailed on the merits, (2) the plaintiff would suffer irreparable

10

injury in the absence of injunctive relief, (3) the hard to the plaintiff would outweigh the harm to the defendants from an injunction, and (4) the injunction would not adversely affect the public interest.

Baker v. Kuritzky, 95 F.Supp.3d 52, 57-58 (2015) citing Joyce v. Town of Dennis, 720 F.3d 12, 25 (1st Cir. 2013).   See also Indian Motorcycle Assocs. III L.P. v. Massachusetts Housing Finance Agency, 66 F.3d 1246, 1249 (1995).

Here, although the jury returned a verdict in favor of the plaintiff, the jury did not identify which statement(s) by the defendants it found to be defamatory, the plaintiff will not suffer irreparable injury in the absence of the requested permanent injunction (which is supported by the plaintiff's appointment to the Shura Council in Saudi Arabia, the plaintiff's appointments to various positions at the United Nations, and the plaintiff's continuing invitations to speak to various organizations), the defendants would be harmed by the requested prior restraint on their speech, and (4) the requested permanent injunction would adversely affect the public interest in obtaining information concerning the plaintiff, who is a public figure and a public official. Therefore, it would be inappropriate for the Court to order the requested injunctive relief.

## III.   **The Proposed Permanent Injunction is Overbroad and Vague**

The plaintiff's proposed order on her motion for permanent injunction is overbroad as it would bar the defendants from making statements not determined to be defamatory and contains vague terms such as "reasonably similar statements" and "directly or indirectly" that do not comply with the requirement, as set forth in Fed.R.Civ.P. 65(d)(1), that ever order granting an injunction state its terms specifically and describe in reasonable detail the act or acts restrained. See McCarthy, 810 F.3d at 461; Hill, 325 S.W.3d at 311, fn 5 (2010).

11

**IV.**     <u>Conclusion</u>

WHEREFORE, the defendants, Samia El-Moslimany and Ann El-Moslimany, hereby respectfully request that this Honorable Court deny Plaintiff's Motion for Permanent Injunction Prohibiting Repetition of Defamatory Statements.

THE DEFENDANTS,
SAMIA E—MOSLIMANY and
ANN EL-MOSLIMANY,
By their attorneys,
MORRISON MAHONEY LLP

<u>/s/ George R. White</u>
Mark R. Segalini, BBO No.:   450780
George R. White BBO# 645752
250 Summer Street
Boston, MA  02210
(617) 439-7500
msegalini@morrisonmahoney.com
grwhite@morrisonmahoney.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, this 3rd day of August, 2016, I have electronically filed a copy of the above and foregoing with Clerk of the Court using the ECF system which sent notification of such filing to counsel of record.

/s/ George R. White
George R. White, BBO No. 645752

12

1448273v.1

# Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HAYAT SINDI, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-10798-IT |
| | * | |
| SAMIA EL-MOSLIMANY and ANN | * | |
| EL-MOSLIMANY, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & PERMANENT INJUNCTION

August 18, 2016

TALWANI, D.J.

Before the court is Plaintiff Hayat Sindi's Motion for Permanent Injunction [#202].

Sindi's motion is ALLOWED as set forth in detail below.

This court may issue a permanent injunction where "(1) the plaintiff has prevailed on the

merits, (2) the plaintiff would suffer irreparable injury in the absence of injunctive relief, (3) the

harm to the plaintiff would outweigh the harm to the defendants from an injunction, and (4) the

injunction would not adversely affect the public interest." Joyce v. Town of Dennis, 720 F.3d 12,

25 (1st Cir. 2016). Sindi has demonstrated that she is entitled to a permanent injunction.

Defendants Samia El-Moslimany and Ann El-Moslimany have waged a five-year

campaign to injure Sindi. Following a seven day trial, the jury found that Samia El-Moslimany

and Ann El-Moslimany defamed Sindi, intentionally inflicted emotional distress, and

intentionally interfered with her contractual and prospective business relations. Specifically as to

defamation, the jury found that Samia El-Moslimany and Ann El-Moslimany made false

statements concerning Sindi with reckless disregard as to truth or falsity. The jury awarded Sindi

a total of $3,500,000 in damages. The court, in turn, finds that numerous statements that were the subject of this action, including but not limited to those listed below, are false and defamatory. Indeed, as to the statements identified below, while Sindi put forth evidence as to their falsity, Samia El-Moslimany and Ann El-Moslimany offered no reliable evidence supporting their claim that the statements are true. The court therefore finds that Sindi has prevailed on the merits.

Sindi has further shown irreparable harm. Samia El-Moslimany and Ann El-Moslimany continued their libelous campaign even up to the night before trial began. See Tr. Ex. 165 (A. El-Moslimany July 10, 2016 Facebook Post). At trial, both admitted under oath that they intended to continue their defamatory campaign in the future. See Tr. Testimony (S. El-Moslimany; A. El-Moslimany). Even following a jury award of $3,500,000 in damages, Samia El-Moslimany's and Ann El-Moslimany's opposition to the motion for permanent injunction speaks only to their purported right to make the statements and the court's purported lack of authority to enjoin the conduct, but offers no assurances that they will voluntarily stop their tortious conduct. The court concludes that absent a permanent injunction, Samia El-Moslimany and Ann El-Moslimany would likely continue to seek to injure Hayat Sindi. See, e.g., Baker v. Kuritzky, 95 F. Supp. 3d 52, 58 (D. Mass. 2015) (concluding that ongoing libelous statements would cause the plaintiff irreparable harm).

The balance of harms favors Hayat Sindi. As narrowly drawn by this court, Samia El-Moslimany and Ann El-Moslimany would suffer no harm based on a permanent injunction because they have "no interest in making libelous statements." Id.

Finally, because there "is no constitutional value in false statements of fact," the public interest will not be harmed by this injunction, narrowly drawn to prohibit Samia El-Moslimany and Ann El-Moslimany from making only false statements of facts. Gertz v. Robert Welch, Inc.,

2

418 U.S. 323, 340 (1974).

Accordingly, the court ORDERS THAT Defendants Samia El-Moslimany and Ann El-Moslimany are hereby enjoined from repeating—orally, in writing, through direct electronic communications, or by directing others to websites or blogs reprinting Samia El-Moslimany's or Ann El-Moslimany's letters and comments—the statements:

1. That Hayat Sindi is an academic and scientific fraud;

2. That Sindi received awards meant for young scholars or other youth by lying about her age;

3. That Sindi was fraudulently awarded her PhD;

4. That Sindi did not conduct the research and writing of her dissertation;

5. That Sindi's dissertation was "ghost researched" and "ghost written";

6. That Sindi's role in the founding of Diagnostics For All was non-existent, and that Sindi did not head the team of six people that won the MIT Entrepreneurship Competition.

IT IS SO ORDERED.

August 18, 2016

/s/ Indira Talwani
United States District Judge

# Exhibit 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HAYAT SINDI,                          *
                                      *
          Plaintiff,                  *
                                      *
     v.                               *        Civil Action No. 13-cv-10798-IT
                                      *
SAMIA EL-MOSLIMANY and ANN            *
EL-MOSLIMANY,                         *
                                      *
          Defendants.                 *

FINAL JUDGMENT

August 18, 2016

This action was tried by a jury with U.S. District Judge Indira Talwani presiding, and the jury has rendered a verdict. Thereafter, the court has made further factual findings in support of a permanent injunction.

It is ordered that:

Plaintiff Hayat Sindi recover from Defendant Samia El-Moslimany the amount of $2,900,000 in compensatory and special damages; $1,241,358.90 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through today; and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

Plaintiff Hayat Sindi recover from Defendant Ann El-Moslimany the amount of $600,000 in compensatory and special damages; $256,832.88 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through today; and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

Defendants Samia El-Moslimany and Ann El-Moslimany are enjoined from repeating—orally, in writing, through direct electronic communications, or by directing others to websites or blogs reprinting Samia El-Moslimany's or Ann El-Moslimany's letters and comments—the statements:

1. That Hayat Sindi is an academic and scientific fraud;

2. That Sindi received awards meant for young scholars or other youth by lying about her age;

3. That Sindi was fraudulently awarded her PhD;

4. That Sindi did not conduct the research and writing of her dissertation;

5. That Sindi's dissertation was "ghost researched" and "ghost written";

6. That Sindi's role in the founding of Diagnostics For All was non-existent, and that Sindi did not head the team of six people that won the MIT Entrepreneurship Competition.

IT IS SO ORDERED.

August 18, 2016                                              /s/ Indira Talwani
                                                              United States District Judge

2

# Exhibit 8

**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **HAYAT SINDI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 13-cv-10798-IT** |
| ) | |
| **SAMIA EL-MOSLIMANY and** ) | |
| **ANN EL-MOSLIMANY,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFF HAYAT SINDI'S OPPOSITION TO DEFENDANTS' RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW**

### i.   Introduction.

Plaintiff Hayat Sindi ("Dr. Sindi") respectfully submits this Opposition to the
Defendants' Motion for Judgment as a Matter of Law.  The Defendants' motion follows a well
reasoned verdict by the jury after trial, using the special verdict form as agreed upon by all
parties.

Not only was the evidence at trial legally sufficient to permit the jury to find in favor of
Dr. Sindi, it was overwhelming.  Dr. Sindi presented several days of testimony by herself and
other witnesses, including former business associates and colleagues.  Even the Defendants' own
testimony overwhelmingly supported the jury's verdict and award in Dr. Sindi's favor.  All of
the evidence presented at trial compellingly demonstrated that Samia and Ann El-Moslimany
engaged in a relentless defamatory campaign against Dr. Sindi, while also intentionally
interfering with Dr. Sindi's current and prospective business relationships and contracts, and
intentionally inflicting emotional distress upon her.  In light of all of this evidence, there is no

1

basis for judgment as a matter of law against Dr. Sindi, and the Defendants' Motion should be denied.

## ii.    **Argument**

A.    <u>Legal Standard</u>

A party seeking to overturn a jury verdict faces an uphill battle – "courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." <u>S.E.C. v. Goldsworthy</u>, C.A. No. 06-10012-JGD, 2008 WL 8901272, at *1 (D. Mass. June 11, 2008) citing <u>Marcano Rivera v. Turabo Med. Ctr. P'ship</u>, 415 F.3d 162, 167 (1st Cir. 2005). The motion can only be granted if "the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome. <u>Goldsworthy</u>, 2008 WL 8901272, at *1 citing <u>Gibson v. City of Cranston</u>, 37 F.3d 731 (1st Cir. 1994). In considering the motion, "the court must not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." <u>Id</u>. citing <u>Wagenmann v. Adams</u>, 829 F.2d 196, 200 (1st Cir. 1987).

B.    The Evidence Presented at Trial Was More Than Sufficient to Support a Jury Verdict in <u>Favor of Dr. Sindi Against Defendants.</u>

a.    Dr. Sindi Presented Overwhelming Evidence to Support the Jury's Verdict in her <u>Favor on her Defamation Claim.</u>

In order to prove defamation, a plaintiff must show that (1) defendants published a statement or statements about her; (2) that the published statements were defamatory in that they tended to hold her up to scorn, hatred, ridicule, or contempt, in the minds of any considerable and respectable segment of the community; (3) that the published statements were false; and (4) that the defendants published the defamatory statements with knowledge that the statements were

2

false or with reckless disregard as to the truth or falsity of the statements.  See, e.g., Ravnikar v. Bogojavlensky, 438 Mass. 627, 630 (2003); Jones v. Taibbi, 400 Mass. 786, 799-800 (1987); Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 858 (1975); McAvoy v. Shufrin, 401 Mass. 593, 597 (1988) ("The elements of a libel case are a false and defamatory written communication of and concerning the plaintiff."); Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 871 (1975); see also Rotkiewicz v. Sadowsky, 431 Mass. 748, 755 (2000); Stone, 367 Mass. at 871; McNamee v. Jenkins, 52 Mass. App. Ct. 503, 506 (2001).  Here, the jury specifically found by a preponderance of the evidence that the Defendants (i) "published a statement (or statements) concerning Dr. Sindi, (ii) that the statement (or statements) about Dr. Sindi were false and defamatory and (iii) the defamatory statement (or statements) either caused Plaintiff economic loss or is of the type that is actionable without proof of economic loss".  See ECF No. 198, pp. 1, 5.   In fact, much of this evidence was uncontested at all.  The jury further found "by clear and convincing evidence that [Defendants] published the defamatory statement (or statements) with knowledge that it was false or with reckless disregard of whether it was false or not."  Id.

Now Defendants claim that "the plaintiff offered no evidence that the defendants published any allegedly defamatory statement with reckless disregard of its falsity."  See ECF No. 213.[1]   However, the jury instructions – to which Defendants did not object – accurately and properly instructed the jury concerning reckless disregard as follows:

> To establish the third element using alternative (b) ("reckless disregard"), Plaintiff must show by clear and convincing evidence that Defendant entertained serious doubts as to the truth of the publication but published anyway.
>
> This inquiry is a subjective one as to the Defendant's attitude toward the truth or falsity of the statement.

---

[1] Defendants do not move for a new trial on the basis that Dr. Sindi did not prove the first three elements of defamation.  See ECF No. 215.

A Defendant **cannot ensure a favorable verdict merely by testifying that she published a false statement under the subjective belief that the statement was true**. You may reach your conclusion as to the Defendant's subjective knowledge or belief based on inferences from other facts in evidence. Thus, in determining whether the Defendant entertained serious doubts as to the truth of the publication but published anyway, **you should consider the totality of the circumstances surrounding the publication such as whether the Defendant investigated known witnesses and examined available sources, whether the Defendant relied on uncorroborated statements from sources without direct personal knowledge, the Defendant's awareness of probable inaccuracies in the statements, whether the Defendant pursued sources who might have contradictory facts from those she was intending to report, whether there were obvious reasons to doubt the veracity of the source or accuracy of the source's information, such as the sources' source of information, motive, bias, or inconsistent statements, and the manner in which the Defendant edited or checked the publication for accuracy**.

ECF No. 194 at p. 25.  Dr. Sindi entered voluminous evidence – in large part through cross-examination of Defendants themselves – that Defendants published their statements with reckless disregard for their truth.  Most remarkably, Ann El-Moslimany testified that she published statements concerning Dr. Sindi without engaging in any meaningful research to verify what it was she was publishing.  See, e.g., Tr. Ex. 44 (email from A. El-Moslimany to J. Ito); Ann El-Moslimany trial testimony.   Samia El-Moslimany testified that she did not have any evidence to support her oft-published statement that Dr. Sindi lied about her age in order to obtain awards to which she would have otherwise not been entitled.  See, e.g., Tr. Ex. 29, 44, 50, 51, 52, 66, 67.  Specifically, she testified that she actually had no idea what information Dr. Sindi submitted as evidence of her age to these organizations, or what the age requirements actually were.  Trial Testimony (S. El-Moslimany).   Samia El-Moslimany was further unable to point to a single quote or statement by Dr. Sindi concerning her age, but instead relied upon media articles written by third parties with no indication that Dr. Sindi provided any information, let alone false information, concerning her age.  See, e.g., Tr. Ex. Nos. 69, 70, 86, 87, 101.  In

fact, one of the articles made clear that the author had relied on Wikipedia for the information

concerning Dr. Sindi.  Tr. Ex. 101 ("Hayat Sindi is a Saudi researcher who has invented a

machine 'combining the effects of light and ultra-sound for use in biotechnology.' (So saith

Wikipedia.)".   The jury also heard Samia and Ann El-Moslimany testify that they did not

interview individuals that they believed would contradict their fabricated narrative of Dr. Sindi,

that they interviewed sources with known biases against Dr. Sindi, such as Dr. Sindi's former

husband's and/or romantic partners, that they relied on uncorroborated sources, that they relied

on witness statements despite known inconsistencies, and they in many instances made

statements without any support whatsoever.  Trial Testimony, S. El-Moslimany, A. El-

Moslimany, M. Berlow.  With specific regard to Mr. Berlow, the jury heard him testify that the

statements Samia El-Moslimany attributed to him were false and inaccurate.  Trial Testimony,

M. Berlow.  There could hardly be better evidence of actual malice that the fabrication of

information attributed to a source who denies ever saying such a thing.  See, e.g., Tosti v. Ayik,

394 Mass. 482 (1985) (actual malice was established where a jury could have found that

defendant fabricated the article or wrote it with knowledge that it might have been false);

Deloach v. Beaufort Gazette, 316 S.E. 2d 139, 141-142 (S.C. 1984) (where purported informant

and reported disputed whether informant was in fact the source of the defamatory matter,

disputed factual issue of credibility arose for the trier of fact).

    In addition, the jury heard (and saw through text messages and emails) Samia El-

Moslimany's pre-planned and coordinated effort to exact revenge upon Dr. Sindi for her

perceived belief that Dr. Sindi had attempted to "steal" her husband.  In one text message Ms. El-

Moslimany threatened to "expose" Dr. Sindi, before she even began her so-called "investigation."

5

Tr. Ex. 2. This evidence made clear to the jury that Samia El-Moslimany began with the conclusion and sought to create evidence to complete the narrative she wished to tell.

Defendants further contend that Dr. Sindi did not present credible testimony that she suffered economic loss or that the defamation was of the type that is actionable without economic loss. See ECF No. 213, p. 10. In so arguing, Defendants misstate the evidence offered at trial. First, there is no dispute that the statements published by the Defendants were the type that "may prejudice plaintiff's profession or business". ECF No. 194, p. 30 (jury instruction concerning statements actionable without proof of economic loss). Defendants' statements were directed to Dr. Sindi's business associates, and contained several statements concerning Dr. Sindi's business activities and her educational background. See, e.g., Tr. Exhibits 29, 44, 50, 51, 52, 66, 67. In fact, on cross-examination, defendants admitted that their statements were ***designed*** to prejudice Dr. Sindi's profession and business. Trial Testimony (S. El-Moslimany, A. El-Moslimany), Tr. Ex. 44 (email to J. Ito stating "This email contains information about Hayat Sindi that could save you from public embarrassment in the future"). Second, Dr. Sindi presented sufficient evidence that defendants' actions caused her economic harm through lost salary, lost investments, and personal monies that she loaned to her company, the Institute for Imagination and Ingenuity ("the i2 Institute"). Trial Testimony, H. Sindi. The jury found Dr. Sindi credible, as they were entitled. See, e.g., Final Jury Instructions (ECF No. 194), p. 7. Defendants did not object to this jury instruction. In an attempt to refute Dr. Sindi's testimony that the Defendants' defamatory statements impaired Dr. Sindi's reputation, entitling her to reputational damages (see, e.g., ECF No. 194, p. 33), Defendants cite to several awards and appointments that Dr. Sindi received before the culmination of the defamatory statements. See, e.g., ECF No. 213 at p. 10-11 (citing the establishment of the i2 Institute, awards conferred

6

in 2012 and 2013, and articles written all before the defamatory statements at issue which took

place as late as the day before trial in 2016 (see, e.g., Tr. Ex. 165)).  Of course, much of this

evidence was not offered at trial for the truth of the matters asserted therein and the Court

sustained an objection made during Mr. White's closing where he sought to make this very

argument.  Moreover, even if this evidence was properly before the jury, it has no bearing on Dr.

Sindi's reputational damages, evidence of which was entered at trial, and which the jury found

credible.  Trial Testimony, H. Sindi.  Similarly, the jury clearly found Dr. Sindi's testimony

concerning her emotional distress and mental suffering to be credible.  Id.

There is no basis upon which to enter judgment as a matter of law (and contrary to the

jury's determination) on Dr. Sindi's defamation claim against Samia and Ann El-Moslimany. As

a matter of law, Dr. Sindi presented evidence sufficient to support each of the elements of

defamation, including the heightened standard required for a public figure.  Defendants' motion

should be denied.

      b.      Dr. Sindi Presented Overwhelming Evidence to Support the Jury's Verdict in her
             Favor on her Claim for Intentional Interference with Contractual Relationships.

In order to recover for tortious interference with contractual relations, a plaintiff must

prove "(1) the existence of a contract or a business relationship which contemplated economic

benefit; (2) the defendant's knowledge of the contract or business relationship; (3) the

defendant's intentional interference with the contract or business relationship for an improper

purpose or by improper means; and (4) damages."  Brandon Associates, LLC v. Failsafe Air

Safety Systems Corp., 384 F. Supp.2d 442, 446 (D. Mass. 2005) citing Bourque v. Cape

Southport Associates, LLC, 60 Mass. App. Ct. 271 (2004).  Dr. Sindi met her burden by proving

that she had agreements with, among others, the Institute for Imagination and Ingenuity ("the i2

Institute"), that Defendants were aware of that contract, and that the Defendants intentionally

interfered with that contract for an improper purpose or by an improper means.  Finally, Dr.

Sindi presented clear and credible evidence that she was personally damaged by Defendants'

actions, including but not limited to loss of salary and other benefits from the i2 Institute.[2]

Testimony presented at trial evidenced that through emails, internet postings, flyers and

banners displayed at conferences, Defendants intentionally interfered with the contract between

Dr. Sindi and the i2 Institute, particularly through communications targeted at the i2 Board

members.  Specifically, on December 22, 2012, Ann El-Moslimany sent an email to Mr. Ito (a

member of the i2 Institute's advisory board) containing a myriad of defamatory statements

concerning Dr. Sindi.  See Trial Ex. 44; Trial Testimony (Ito, A. El-Moslimany, S. El-

Moslimany, Sindi).  Samia El-Moslimany admitted at trial that she had significant involvement

in writing the email that her mother Ann El-Moslimany ultimately sent.  Trial Testimony (A. El-

Moslimany, S. El-Moslimany).  Defendant Ann El-Moslimany further testified that she sent the

same email to several members of the i2 Institute's Board of Directors at the same time.  Trial

Testimony (A. El-Moslimany).  The email contained several negative and defamatory statements

about Dr. Sindi, including but not limited to the following[3]:

- "I have done extensive research on Hayat Sindi, finding her personal, professional and academic resume is fraught with complete untruths and exaggeration, calling into question her credentials as a scholar and a professional"
- "Currently her problematic background is coming under scrutiny from both Middle East and international media outlets."
- "… several board members of the i2 Institute [] have launched their own proactive investigations after my contact with them."
- "… Sindi had little, if no participation, in her most publicly touted achievement – the actual scientific development and invention of the diagnostic tool developed in the Harvard lab of Professor George Whitesides and the founding of the company,

---

[2] The jury was plainly focused on this arrangement in their deliberations by asking a specific question about quantifying damages for Dr. Sindi's losses associated with the decimation of the i2 Institute.

[3] While many of the defamatory statements were included in the body of the email, the vast majority were contained in a document included with the email titled "Hayat Sindi in Brief".  See Tr. Ex. 44.  That document was widely distributed, in various forms, via email and the internet.  See, e.g., Tr. Exs. 66, 67, 163.

Diagnostics For All.  It is for this invention which was not hers, that Sindi was awarded the National Geographic Emerging Scholar Award, the PopTech Innovation Fellowship, and was honored with a UNESCO Ambassadorship"

- "False and Exaggerated Academic and Professional Accomplishments Resulting in Undeserved Accolades"
- "PhD research conducted and dissertation allegedly written by Dr. Adrian Stevenson … while under the advisorship of Professor Christopher Lowe, at Cambridge University.."
- "Falsification of her age by 11 years";
- "By misrepresenting her age, Sindi robbed opportunities for recognition, public relations support, funding opportunities and career advancement, from the very youth she claims to support with her new institute, http://i2institute.org";
- "Fraudulent claims of inventions".

Later, on February 12, 2014, Samia El-Moslimany sent an email to "a number of US State Department employees, and the US Consul General in Jeddah [Saudi Arabia]".  Tr. Ex. 66. Many of the above-listed false and defamatory statements were repeated in this email, and the email included new statements, as well.  Tr. Ex. 66; Exhibit A.  On the same date, another email was sent to "i2 Institute Board Members and Members of the Media," from the alias "Abdullah Alhaq".  Tr. Ex. 67; Exhibit A.  Several of the false and defamatory statements contained in this email were identical to the statements previously made by Ann and Samia El-Moslimany, and the email included an exact duplicate of the "Hayat Sindi in Brief" document.  See Tr. Ex. 67. The jury was entitled to infer from the facts presented at trial that Samia El-Moslimany sent Exhibit 67 (which was sent to the Board Members of the i2 Institute), as well as the nearly-identical Exhibit 66, which was Samia El-Moslimany admitted that she sent on the same date. Trial Testimony (S. El-Moslimany).

Defendants' improper motives were also established at trial.  Dr. Sindi presented evidence that Defendants had made explicit threats outlining their intent to interfere with Dr. Sindi's "business associates".   These threats began in late 2011, when she received threatening and inflammatory emails and text messages from Samia El-Moslimany concerning Samia's belief that Dr. Sindi had engaged in an inappropriate relationship with Samia's husband, Fouad

9

Dehlawi.  See Tr. Exs. 2, 23, 25.  See also, Tr. Testimony of Ann El-Moslimany.  The

communications from Samia contained rage and threats, including the following statements:

- "You will probably get cancer at this rate with the number of people praying against you" (Tr. Ex. 2);
- "You will be exposed for the hypocrite & fraud that you are" (Tr. Ex. 2);
- "I have just began to confront you" (Tr. Ex. 23);
- "Every night this Ramadan, I joined my children, my mother, my friends and others, quite frankly around the world, that you have oppressed, in praying that God exposes you and delivers justice to you both in this life and the hereafter" (Tr. Ex. 23);
- "I am smiling as I write this … I hope I have caused you some concern, and I pray that your Eid is sufficiently disturbed" (Tr. Ex. 23);
- "You clearly still do not know me nor were you aware of who you were messing with when you decided to selfishly destroy my family" (Tr. Ex. 25);
- "I take great pleasure in knowing that you will rue the day" (Tr. Ex. 25);
- "I am here forever" (Tr. Ex. 25);
- "I (& many others who you have oppressed) pray to our Lord many times a day to expose you to your mother & siblings, your friends, your business associates, your fans, & your country for the Munafika[4] that you are" (Tr. Ex. 25); and
- "I am grateful that your poor father isn't alive to witness the truth about his sinful, selfish, conniving, Munafika of a daughter" (Tr. Ex. 25).

Finally, Dr. Sindi provided evidence at trial that she suffered damages as a result of

Defendants' conduct.  Dr. Sindi testified that she had never received the salary to which she was

entitled from the i2 Institute, as a result of Defendants' interference.  She also testified that she

had loaned the i2 Institute significant funds from her personal accounts, and that she personally

paid several of i2's expenses.  Further, according to the jury instructions (to which Defendants

did not object), Dr. Sindi was not required to "prove her loss of profits with mathematical

precision."  See Jury Instructions, ECF No. 191 at p. 44.  See also Selmark Assocs., Inc. v.

Ehrlich, 467 Mass. 525, 545 (2014).

Faced with the above-outlined evidence, the jury's verdict on Dr. Sindi's count for

intentional interference with contractual relations was consistent with the clear weight of the

evidence, and did not constitute a miscarriage of justice.

---

[4] "Munafika" translates as "hypocrite" in English.  Trial Testimony (H. Sindi, S. El-Moslimany).

c.      Dr. Sindi Presented Overwhelming Evidence to Support the Jury's Verdict in her Favor on her Claim for Intentional Interference with Prospective Business Relationships.

To recover for tortious interference with prospective business relationships, a plaintiff must show that "1) [s]he had an advantageous relationship with a third party (e.g., a present or prospective contract); 2) the defendant knowingly induced a breaking of the relationship; 3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and 4) the plaintiff was harmed by the defendant's actions." Angiuoni v. Town of Billerica, 999F.Supp.2d 318 (D. Mass. 2014) (Gorton, J.) citing Blackstone v. Cashman, 448 Mass. 255 (2007).  Further, Dr. Sindi was not required to prove that she had actually entered into a specific contract or agreement with investors or others, but rather that she had a reasonable expectation of a future economic benefit.  Bingo Innovative Software, LLC v. Cahill, No. SUCV2010-02743-A, 2011 WL 2652170, at *6 (Mass. Super. Ct. June 9, 2011).  Concerning damages, Dr. Sindi was not required to prove an exact dollar amount lost.  As the jury was instructed (and Defendants did not object), the jury was entitled to "award the plaintiff such a sum as [it] believe[d], from the evidence, will fairly and reasonable compensate the plaintiff for the damage, if any, she sustained because of the Defendants' acts….".

At trial, Dr. Sindi presented testimony and other evidence that she had a reasonable expectation of investments from various individuals, including Fadi Ghandor, Al Faisal University, Siemens Corporation, Naser Al Tayyer, Ahmed Ashkar, Hisham A. Bahkail, and others.  She also presented testimony that she had a reasonable expectation that others would become engaged with her business endeavors, which would in turn result in economic advantage for herself (and her projects).  Specifically, she was looking to partner with the US Consul General in Jeddah and the US State Department, both of which received an email directly from Samia El-Moslimany.  Exhibit 66 (see, supra, for specific statements contained in that email).  It

11

was clear not only from Defendants' testimony, but also from the mere fact that they sent these emails that they "knowingly induced a breaking of the relationship" between Dr. Sindi and these entities. Both Defendants testified that they intended that outcome. Trial Testimony (S. El-Moslimany; A. El-Moslimany). Further, as indicated above, Dr. Sindi entered evidence that both Defendants undertook these actions with improper motive and means. See, e.g., Tr. Exs. 2, 23, 25; Trial Testimony (A. El-Moslimany). Dr. Sindi testified that she had a reasonable expectation that the potential investors would invest significant sums in both of Dr. Sindi's businesses (the i2 Institute and Sonoptix). In that event, Dr. Sindi would, in turn, have personally benefitted, through salary and other benefits, from those companies' successes.

Faced with the above-outlined evidence, the jury's verdict on Dr. Sindi's count for intentional interference with prospective business relationships was consistent with the clear weight of the evidence, and did not constitute a miscarriage of justice.

> d.   Dr. Sindi Presented Overwhelming Evidence to Support the Jury's Verdict in her Favor on her Intentional Infliction of Emotional Distress Claim

At trial, Dr. Sindi presented evidence sufficient for the jury to find that (1) Defendants intended to inflict emotional distress upon her, or that they knew or should have known that emotional distress was the likely result of their conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community'; (3) that the actions of the Defendants were the cause of the Plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was 'severe'. See, e.g., Rimscha v. Suprenant, 71 Mass. App. Ct. 1114 (2008) citing Agis v. Howard Johnson Co., 371 Mass. 140, 144-145 (1976). Defendants' claim that there was "no evidence that the defendants' conduct reaches the threshold level of 'extreme and outrageous'" is false. ECF 213 at p. 3. Dr. Sindi presented evidence (including the testimony of both Defendants) that the Defendants

followed her to conferences in Washington, D.C., Princeton, New Jersey, and Saudi Arabia.

Trial Testimony (S. El-Moslimany, A. El-Moslimany).  She further presented evidence that at

these conferences, Defendants distributed leaflets and displayed large banners with the intent that

the conference attendees, and the public surrounding the conference, would be exposed to

Defendants' defamatory statements.  Id.; Tr. Exs. 3, 4.  Dr. Sindi testified about her being

followed in Cambridge, Massachusetts by the Defendants and being handed one of the

Defendants' flyers by a stranger.  Trial Testimony (H. Sindi).  Dr. Sindi was so distressed by this

conduct that she was compelled to contact the police.  Id.  Samia El-Moslimany cannot deny that

she intended to inflict emotional distress on Dr. Sindi, as she made that intent known, in emails

and text messages that she admitted she sent to Dr. Sindi:

- o ***"You will probably get cancer at this rate with the number of people praying against you"*** (Tr. Ex. 2) (emphasis added);
- o "You will be exposed for the hypocrite & fraud that you are" (Tr. Ex. 2);
- o "I have just began to confront you" (Tr. Ex. 23);
- o "Every night this Ramadan, I joined my children, my mother, my friends and others, quite frankly around the world, that you have oppressed, in praying that God exposes you and delivers justice to you both in this life and the hereafter" (Tr. Ex. 23);
- o ***"I am smiling as I write this … I hope I have caused you some concern, and I pray that your Eid is sufficiently disturbed"*** *(Tr. Ex. 23) (emphasis added);*
- o "You clearly still do not know me nor were you aware of who you were messing with when you decided to selfishly destroy my family" (Tr. Ex. 25);
- o ***"I take great pleasure in knowing that you will rue the day"*** (Tr. Ex. 25) (emphasis added);
- o "I am here forever" (Tr. Ex. 25);
- o "I (& many others who you have oppressed) pray to our Lord many times a day to expose you to your mother & siblings, your friends, your business associates, your fans, & your country for the Munafika[5] that you are" (Tr. Ex. 25); and
- o "I am grateful that your poor father isn't alive to witness the truth about his sinful, selfish, conniving, Munafika of a daughter" (Tr. Ex. 25).

The jury was uniquely positioned in this case, after hearing all of the evidence including

but not limited to the Defendants' own testimony, to conclude that the Defendants engaged in an

---

[5] "Munafika" translates as "hypocrite" in English.  Trial Testimony (Sindi, S. El-Moslimany).

13

'extreme and outrageous" course of conduct, and that their conduct was 'beyond the bounds of decency' and was "utterly intolerable in a civilized community". <u>Rimscha</u>, 71 Mass. App. Ct.  at 1114.  Further, it is well-settled that "[w]here reasonable men may differ, it is for the jury … to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability".  <u>Wall v. Altenhof</u>, 57 Mass.App.Ct. 1117 (2003) citing Restatement (Second) of Torts § 46, comment h (1965).

As Defendants concede in their motion, extreme and outrageous behavior is often found where a Defendant continues to engage in offensive acts.  ECF No. 215, p. 3.  Defendants' conduct in this case began in 2011, and continued to the eve of trial.  Defendants admittedly posted on social media platforms about Dr. Sindi dozens of times, and made known at trial their intent to continue to do so.  Trial Testimony (S. El-Moslimany, A. El-Moslimany, Z. Dehlawi).  They sent emails to Dr. Sindi's colleagues, board members, and professional liaisons.  <u>Id</u>.  They posted – or facilitated the posting of – defamatory and other harassing materials on the internet, where any of Dr. Sindi's prospective business partners could access the material at any time, from the time of their posting in 2012 through the present day.  <u>See, e.g.</u>, Tr. Ex. 31.  Defendants' conduct was unquestionably continuous, and the weight of the evidence fully supported the jury's determination that Defendants did, in fact, intentionally inflict emotional harm on Dr. Sindi.

The jury was also presented with Dr. Sindi's testimony concerning the emotional distress she suffered.  The Court properly instructed the jury (without objection by Defendants) that it should "award the equivalent in money for the actual loss caused by the Defendant's intentional infliction of emotional distress" and that examples of distress and anxiety include all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment,

anger, chagrin, disappointment, worry, and nausea." ECF No. 194, p. 51. Dr. Sindi testified

that felt shame, fear, humiliation, and embarrassment, and that as a result of those feelings, she

suffered from sleeplessness, weight loss, headaches, fatigue and other physical reactions. Trial

Testimony (H. Sindi). Further, in light of the continual nature of the Defendants' actions, Dr.

Sindi suffered this emotional distress (and the resulting physical distress) for as much as *six*

*years*. Trial Testimony (H.Sindi). The jury found Dr. Sindi's testimony credible, as they were

entitled to do. See ECF No. 194, p. (jury instruction concerning the credibility of witnesses).

The jury's careful consideration of Dr. Sindi's testimony is evidenced by the fact that they did

not award damages based on Ann El-Moslimany's actions, but only on Samia El-Moslimany's

actions. The jury clearly carefully weighed the evidence and made a determination that Samia

El-Moslimany was liable for intentional infliction of emotional distress.

### iii.     Conclusion

In light of this wealth of evidence, and other evidence presented at trial demonstrating that

Samia and Ann El-Moslimany made false and defamatory statements with actual knowledge of,

or reckless disregard for, their falsity, that Samia and Ann El-Moslimany tortuously interfered

with Dr. Sindi's contractual and prospective business relationships, and that Samia and Ann El-

Moslimany intentionally inflicted emotional harm on Dr. Sindi, judgment as a matter of law is

unwarranted and the Defendants' motion should be denied.

Respectfully submitted,

HAYAT SINDI

By her attorneys,

/s/ Suzanne Elovecky
David H. Rich (BBO # 634275)
drich@toddweld.com
Suzanne Elovecky (BBO # 670047)
selovecky@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Dated:  September 29, 2016          617-720-2626

## CERTIFICATE OF SERVICE

I, Suzanne Elovecky, hereby certify that this document has been filed through the ECF

system, will be sent electronically to the registered participants as identified on the notice of

Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered

participants on this date.

/s/ Suzanne Elovecky
Suzanne Elovecky

Dated:  September 29, 2016

4843-5217-5929, v. 2

16

# Exhibit 9

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| HAYAT SINDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-10798-IT |
| | ) | |
| SAMIA EL-MOSLIMANY and | ) | |
| ANN EL-MOSLIMANY, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF HAYAT SINDI'S OPPOSITION TO DEFENDANTS'**
**RENEWED MOTION FOR A NEW TRIAL AND/OR REMITTITUR**

### i.   Introduction

The trial of Dr. Sindi's claims against Defendants Samia and Ann El-Moslimany was comprehensive and fair, with six days of testimony and eight days of trial.   Defendants had full and fair opportunity to develop and present their defense as to all of Dr. Sindi's claims and to defend their actions.   The twelve (12) jurors were exemplary and gave the evidence their full attention.   After deliberating for approximately nine hours, they rendered a considered and deliberate verdict.   They reviewed several statements made by Defendants, as well as the evidence supporting Dr. Sindi's claims for intentional interference with contractual relations, intentional interference with prospective business relationships, and intentional infliction of emotional distress.   They found that Dr. Sindi met her burden on all counts.   After their careful consideration of the evidence on damages, the jury awarded Dr. Sindi $400,000 for defamation by Samia El-Moslimany, $2,000,000 for intentional interference with contractual relationships by Samia El-Moslimany, $400,000 for intentional interference with prospective business

1

relationships by Samia El-Moslimany; $100,000 for intentional interference of emotional distress by Samia El-Moslimany; $100,000 for defamation by Ann El-Moslimany; $400,000 for intentional interference with contractual business relationships by Ann El-Moslimany; and $100,000 for intentional interference with prospective business relation by Ann El-Moslimany. While the jury found that Dr. Sindi proved by a preponderance of the evidence that Ann El-Moslimany intentionally caused Dr. Sindi to suffer severe emotional distress, they did not find that Dr. Sindi suffered damages as a result further evidencing their care and attention to detail in rendering a considered verdict.  The Court's jury instructions were without error, and the Defendants made no objections to those instructions prior to trial, during trial, or through their post-trial motions.  Accordingly, Defendants have waived any objections to the jury charge.

Although Samia and Ann El-Moslimany are unhappy with the outcome of the trial, the jury exercised reasonable and honest judgment in accordance with the law, and there was no miscarriage of justice.  Defendants' motion for a new trial or, in the alternative, remittitur should be denied.

## ii.    Argument

### A.    Legal Standard

Rule 59 only permits a new trial "if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice."  Fryer v. A.S.A.P. Fire and Safety Corp., Inc., 680 F.Supp.2d 317, 324 (D. Mass. 2010) citing Crowe v. Marchand, 506 F.3d 13, 19 (1st Cir. 2007); Burke v. McDonald, 572 F.3d 5137 (1st Cir. 2009).   Remittitur is only appropriate where the result of the award is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand."  See Sony BMG Music Entertainment v. Tenenbaum, 660 F.3d 487, 509 (1st Cir. 2011) citing Correa

v. Hosp. S.F., 69 F.3d 1184, 1197 (1st Cir. 1995). "A jury's award will withstand scrutiny …

unless the damages are 'so grossly disproportionate to any injury established by the evidence as

to be unconscionable as a matter of law." Fryer, 680 F. Supp. At 324-25 citing Tobin v. Liberty

Mutual Insurance Co., 553 F.3d 121, 144 (1st Cir. 2009); see also Burke, 572 F.3d at 58 ("[w]e

will uphold a jury award if it is a result of any rational appraisal or estimate of the damages that

could be based on the evidence before the jury"). In reviewing a jury's award, a court must

review the evidence in the light most favorable to the prevailing party. Eastern Mountain

Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 502 (1st Cir. 1994).

After hearing more than a week of evidence and deliberating for approximately 9 hours,

the jury reached a considered, just and fair verdict, based upon the totality of the evidence.

Defendants have not come close to demonstrating that there was a miscarriage of justice or that

the damages awarded are unconscionable as a matter of law, and their motion for a new trial or,

in the alternative, remittitur, should be denied.

**B.** **The Evidence Fully Supports the Jury's Conclusions Concerning All of the Elements of Defamation, Tortious Interference and Intentional Infliction of Emotional Distress**

The Defendants' arguments in support of their motion for a new trial are identical to the

arguments advanced in support of their Motion for Judgment Notwithstanding The Verdict. In

an effort to avoid burdening the Court with duplicative arguments, Dr. Sindi respectfully refers

the Court to her Opposition to Defendants' Motion for Judgment Notwithstanding The Verdict.

Those arguments establish that significant, substantial and in many cases unrebutted evidence

supported each and every element of the Plaintiff's claims and that the jury's verdict was

supported by the evidence.

**C.      The Jury's Damages Award Was Not Grossly Excessive and Was Supported by the Weight of the Evidence**

Courts rarely override a jury's judgment on the appropriate amount of damages to be awarded.  Brown v. Freedman Baking Co., Inc., 810 F.2d 6, 11 (1st Cir. 1987).  "[T]he jury's otherwise supportable verdict stands unless [it is] 'grossly excessive' or 'shocking to the conscience'".  Id. citing LaForest v. Autoirdad de las Fuentes Fluviales de P.r., 536 F.2d 443, 447 (1st Cir. 1976).  It is only when the verdict is "greatly disproportionate to the injury proved," Statkus v. Metropolitan Transit Auth., 335 Mass. 172, 174 (1956), that the court should set aside the verdict, a situation that does not exist in this case.  See also Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 404 (2005) ("We are aware of the general rule that a reviewing court should not disturb a jury's award of damages unless it is clearly excessive in relation to what the plaintiff's evidence has demonstrated damages to be."); Walsh v. Chestnut Hill Bank & Trust Co., 414 Mass. 283, 292 (1993) ("Motions for a new trial on the theory that the damages were inadequate or excessive 'ought not to be granted unless on a survey of the whole case it appears to the judicial conscience and judgment that otherwise a miscarriage of justice will result.'").  Finally, the trial court is uniquely positioned to affirm the jury's award of damages because of that court's "greater familiarity with local community standards and with the witnesses' demeanor at the trial."  Fishman v. Clancy, 763 F.2d 485, 489-90 (1st Cir. 1985).

1.      Defamation.

As described in her Opposition to Defendants' Motion for Judgment Notwithstanding The Verdict, Dr. Sindi presented more than sufficient evidence to support the jury's finding of both liability and damages for each of her claims.   To support damages for her defamation claim, Dr. Sindi presented evidence that she suffered economic loss, reputational harm, and emotional distress.  Each of these types of harm support the jury's award of $400,000 as to

4

Samia El-Moslimany, and $100,000 as to Ann El-Moslimany.  Further, the jury was instructed

that Dr. Sindi was required to prove that the defamatory statement(s) either "(a) caused Plaintiff

economic loss; or (b) is the type of statement that is actionable without proof of economic loss."

ECF No. 194, p. 28.  Consistent with the law, the jury was further instructed that if the statement

was one that "may prejudice plaintiff's profession or business … Plaintiff does not have to prove

that the statement caused her economic loss."  Id. at p. 30.  The jury was further instructed that

they could "consider three types of damages: economic loss damages, compensatory damages

and nominal damages."  Id. at p. 31.  For economic loss damages, the jury was instructed that

Plaintiff is entitled to recover for "specific losses having an economic value, incurred as a result

of the Defendants' defamatory publication or reasonably foreseeable republication by others,"

and that the economic loss damages may include "loss of an existing advantage, such as wages

from a job, employment benefits, or business clients … [or] loss of a future advantage, such as

inability to get a new job."  Id. at p. 32.  The jury was further instructed that in order to obtain

compensatory damages, "Plaintiff must have proven to you … that she was injured as a result of

the Defendant's defamatory publication or reasonably foreseeable republication by others.

Injury may include impairment of Plaintiff's reputation and standing in the community,

emotional distress, personal humiliation, shame and disgrace, and mental suffering caused by the

defamation."  Id. at p. 33.  (Defendants objected to none of these instructions at trial, and these

instructions do not form the basis of Defendants' motion.)

Dr. Sindi offered evidence for both economic loss and compensatory damages at the trial

of this matter.  Dr. Sindi testified as to the loss of investors, the loss of income from the i2

Institute, and the fact that prospective business partners no longer wanted to do business with

her.  Trial Testimony (H. Sindi).  Dr. Sindi further testified to the fact that her reputation was

damaged, that she suffered emotional distress, personal humiliation, shame, disgrace, and mental suffering.  Once again, it is important to note that the defamation damages suffered by Dr. Sindi took place over a several year period – from 2012 into 2016.  The defamatory statements were repeated on multiple occasions, and publications were made directly to Dr. Sindi's business associates.  Given all of the evidence presented, the jury's damages award of $400,000 as to Samia El-Moslimany and $100,000 as to Ann El-Moslimany was consistent with the weight of the evidence, and was not grossly excessive.

      2.     <u>Intentional Interference with Contractual and Prospective Business Relationships</u>

Dr. Sindi presented sufficient evidence at trial to support her claims of intentional interference with both contractual and prospective business relationships.  Similarly, Dr. Sindi presented evidence sufficient to support the jury's damages awards for these claims.  The jury's award was based on the weight of the evidence, and not on "impermissible speculation and conjecture."  ECF No. 215, p. 15.  Dr. Sindi testified at trial that as a result of Defendants' conduct, she lost investors, a contract with a publisher, lost income from the i2 Institute, and was forced to infuse the company with her own funds, and to pay the company's costs from her own funds.  Trial Testimony (H. Sindi).  Further, and as previously stated, Defendants' conduct took place over the course of several years – from 2011 through and including 2016, and the damages suffered by Dr. Sindi spanned that time period.

      3.     <u>Intentional Infliction of Emotional Distress</u>

As reflected by the jury's considered verdict, Dr. Sindi presented evidence sufficient at trial to prove all of the elements of intentional infliction of emotional distress.  The jury awarded Dr. Sindi $100,000 resulting from Samia El-Moslimany's intentional infliction of emotional distress.  ECF No. 198 (verdict slip).  As evidence of the jury's careful consideration, the jury awarded no damages resulting from Ann El-Moslimany's actions, despite finding that Ann El-

6

Moslimany did, in fact, intentionally inflict emotional distress on Dr. Sindi.  Id.  The jury's award in favor of Dr. Sindi was supported by the evidence, including Dr. Sindi's own testimony that she suffered headaches, sleeplessness, weight loss, anxiety, fear, fatigue and other symptoms as a result of Samia El-Moslimany's conduct.  Trial Testimony (H. Sindi).  This testimony did not contradict Dr. Sindi's medical records, which simply showed that Dr. Sindi had previously suffered some distress in the wake of her father's death.  Trial Testimony (H. Sindi), Tr. Exs. 104, 105, 106.

Given the nature and character of the harm, the severity of the harm, the length of time Dr. Sindi suffered, and the compelling evidence of causality, the emotional distress award here more than satisfies all of the Stonehill College factors.  See Stonehill College v. MCAD, 441 Mass. 549, 576 (2004).  In such a situation, it would be improper for the court to order a new trial on damages.  See, e.g., Hastings Assocs. v. Local 369 Bldg. Fund, 42 Mass. App. Ct. 162, 171 (1997) ("a judge has no right to set aside a verdict merely because he himself would have assessed the damages in a different amount").

    4.    The Jury's Verdict Was Not Punitive or Based on Passion or Prejudice.

The jury clearly exercised sound discretion in awarding damages following the trial in this matter.  The damages were tied to the weight of the evidence, and through review of the jury instructions and the special verdict form, it is evident that the jury did not include punitive damages within its award.  For each of Dr. Sindi's claims, the Court instructed the jury as to damages, and did not include or infer that punitive damages were to be considered.  See ECF No. 194 at pp. 29-34, 44-45, 48, 51.  Further the special verdict form – which was agreed to by the parties – did not include an option to include punitive damages.  ECF No. 198.

Nor is there any evidence that the jury's determination of liability or damages was based on passion or prejudice.  Courts will only find that a damages award is based on passion or prejudice where the award is "so great … that it may be reasonably presumed that the jury, in assessing them, did not exercise a sound discretion, but were influenced by passion, partiality, prejudice or corruption."  Reckis v. Johnson & Johnson, 471 Mass. 272, 466-67 (2015) (upholding a $50,000,000 jury award).  Here, there is no indication that the jury was motivated by passion or prejudice.  In fact, the circumstances surrounding the jury deliberations make clear that the jury was careful and thoughtful in their deliberations.  Not only did the jury deliberate for approximately nine (9) hours, but they further submitted three questions to the Judge during deliberations, all concerning damages.  See ECF No. 201, pp. 4-7.   The jury's damages award here was based on the weight of the evidence, and was not grossly excessive.  There is no basis upon which to disturb the jury's carefully considered verdict and award.

### iii.  Conclusion

WHEREFORE, for the foregoing reasons, Dr. Hayat Sindi respectfully requests the Court not order a new trial and not enter a remittitur of damages.

Respectfully submitted,

HAYAT SINDI

By her attorneys,

/s/ Suzanne Elovecky
David H. Rich (BBO # 634275)
drich@toddweld.com
Suzanne Elovecky (BBO # 670047)
selovecky@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Dated:  September 29, 2016                617-720-2626

8

**CERTIFICATE OF SERVICE**

I, Suzanne Elovecky, hereby certify that this document has been filed through the ECF

system, will be sent electronically to the registered participants as identified on the notice of

Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered

participants on this date.

/s/ Suzanne Elovecky
Suzanne Elovecky

Dated:  September 29, 2016

4842-4417-2857, v. 2

9

# Exhibit 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HAYAT SINDI, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-10798-IT |
| | * | |
| SAMIA EL-MOSLIMANY and ANN | * | |
| EL-MOSLIMANY, | * | |
| | * | |
| Defendants. | * | |

AMENDED FINAL JUDGMENT

October 6, 2016

This action was tried by a jury with U.S. District Judge Indira Talwani presiding, and the jury has rendered a verdict. Thereafter, the court has made further factual findings in support of a permanent injunction.

It is ordered that:

Plaintiff Hayat Sindi recover from Defendant Samia El-Moslimany the amount of $1,476,000 in compensatory and special damages; $631,808.88 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

Plaintiff Hayat Sindi recover from Defendant Ann El-Moslimany the amount of $344,000 in compensatory and special damages; $147,250.85 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

Defendants Samia El-Moslimany and Ann El-Moslimany are enjoined from repeating—orally, in writing, through direct electronic communications, or by directing others to websites or blogs reprinting Samia El-Moslimany's or Ann El-Moslimany's letters and comments—the statements:

1. That Hayat Sindi is an academic and scientific fraud;

2. That Sindi received awards meant for young scholars or other youth by lying about her age;

3. That Sindi was fraudulently awarded her PhD;

4. That Sindi did not conduct the research and writing of her dissertation;

5. That Sindi's dissertation was "ghost researched" and "ghost written";

6. That Sindi's role in the founding of Diagnostics For All was non-existent, and that Sindi did not head the team of six people that won the MIT Entrepreneurship Competition.

IT IS SO ORDERED.

October 6, 2016                                        /s/ Indira Talwani
                                                       United States District Judge

2

# Exhibit 11

AFTER RECORDING MAIL TO:

Law Offices of John G. Llewellyn, PLLC.
4847 California Ave. SW, Suite 100
Seattle, Washington 98116



**20161107000004**
LLEWELLYN LAW  DT
PAGE-001 OF 003          76.00
11/07/2016 08:44
KING COUNTY, WA

## DEED OF TRUST

THIS DEED OF TRUST, made this 4ᵗʰ day of November, 2016, between SAMIA EL-MOSLIMANY and
ANN PAXTON EL-MOSLIMANY, GRANTORS, whose address is 2655 SW 151 Place, Burien, Washington
98166, LAW OFFICES OF JOHN G. LLEWELLYN, PLLC, TRUSTEE, whose address is 4847 California Ave. SW,
Suite 100, Seattle, Washington 98116, and AZIZA M. YOUSEF, BENEFICIARY, whose address is P.O. Box
54301, Riyadh 11415, Saudi Arabia.

WITNESSETH:  Grantors hereby bargain, sells, and conveys to Trustee in trust, with power of sale, the
following described real property located in King County, Washington:

    LOT 12, SEAHURST WEST, ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 80 OF
    PLATS, PAGES(S) 45, IN KING COUNTY, WASHINGTON.

Assessor's Property Tax Parcel/Account Number: 763800-0120-00

Which real property is not used principally for agricultural or farming purposes, together with all the
tenements, hereditaments, and appurtenances now or hereafter thereunto belonging or in any way
appertaining, and the rents, issues, and profits thereof.

This deed is for the purpose of securing performance of each agreement of Grantors herein contained,
and payment of the sum of Three Hundred, Forty-Six Thousand, Six Hundred and Sixty-Six Dollars
($346,666.00) without interest, in accordance with the terms of the Promissory Notes executed on
September 1, 2016, corresponding to 11/29/1437 of the Hijra Calendar, payable to Beneficiary on order,
and made by Grantors, and all renewals, modifications, and extensions thereof, and also such further
sums as may be advanced or loaned by Beneficiary to Grantors, or any of their successors or assigns,
together with interest thereon at such rate as shall be agreed upon.

To protect the security of this Deed of Trust, Grantors covenant and agree:

1. To keep the property in good condition and repair; to permit no waste thereof, to complete any
   building, structure, or improvements being built thereon; to restore promptly any building,
   structure, or improvement thereon which may be damaged or destroyed; and to comply with all
   laws, ordinances, regulations, covenants, conditions, and restrictions affecting the property.
2. To pay before delinquent all lawful taxes and assessments upon the property; to keep the
   property free and clear of all other charges, liens, or encumbrances impairing the security of this
   Deed of Trust.
3. To keep all buildings now or hereafter erected on the property described herein continuously
   insured against loss by fire of other hazards in an amount not less than the total debt secured by

Initials: _____
Initials: _____

Page 1 of 3

this Deed of Trust. All policies shall be held by the Beneficiary, and be in such companies as the Beneficiary may approve and have loss payable first to the Beneficiary, as its interest may appear, and then to the Grantors. The amount collected under any insurance policy may be applied upon any indebtedness hereby secured in such order as the Beneficiary shall determine. Such application by the Beneficiary shall not cause discontinuance of any proceedings to foreclose this Deed of Trust. In the event of foreclosure, all rights of the Grantors in insurance policies there in force shall pass to the purchaser at the foreclosure sale.

4. To defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, and to pay all costs and expenses, including cost of title search and attorney's fees in a reasonable amount, in any such action or proceeding, and in any suit brought by Beneficiary to foreclose this Deed of Trust.

5. To pay all costs, fees, and expenses incurred in connection with this Deed of Trust, including the expenses of the Trustee incurred in enforcing the obligation secured hereby and Trustee's and attorney's fees actually incurred, as provided by statute.

6. Should Grantors fail to pay when due any taxes, assessments, insurance premiums, liens, encumbrances, or other charges against the property hereinabove described, Beneficiary may pay the same, and the amount so paid, with interest at the rate set forth in the note secured hereby, shall be added to and become a part of the debt secured in this Deed of Trust.

IT IS MUTUALLY AGREED THAT:

1. In the event any portion of the property is taken or damaged in an eminent domain proceeding, the entire amount of the award or such portion as may be necessary to fully satisfy the obligation secured hereby, shall be paid to Beneficiary to be applied to said obligation.

2. By accepting payment of any sum secured hereby after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to do so.

3. The Trustee shall reconvey all or any part of the property covered by this Deed of Trust to the person entitled thereto, on written request of the Grantors and the Beneficiary, or upon satisfaction of the obligation secured and written request for reconveyance made by the Beneficiary or the person entitled thereto.

4. Upon default by Grantors in the payment of any indebtedness secured hereby or in the performance of any agreement contained herein, all sums secured hereby shall immediately become due and payable at the option of the Beneficiary. In such even and upon written request of Beneficiary, Trustee shall sell the trust property, in accordance with the Deed of Trust Act of the State of Washington, at public auction to the highest bidder. Any person except Trustee may bid at Trustee's sale. Trustee shall apply the proceeds of the sale as follows: (1) to the expense of the sale, including a reasonable Trustee's fee and attorney's fee; (2) to the obligation secured by this Deed of Trust; and, (3) the surplus, if any, shall be distributed to the persons entitled thereto.

5. Trustee shall deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser the interest in the property which Grantors had or had the power to convey at the time of their execution of this Deed of Trust, and such as they may have acquired thereafter. Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Deed of Trust, which recital shall be prima facie evidence of such compliance and conclusive thereof in favor of bona fide purchaser and encumbrances for value.

Initials: _____
Initials: _____

Page 2 of 3

6. The power of sale conferred by this Deed of Trust and by the Deed of Trust Act of the State of Washington is not an exclusive remedy; Beneficiary may cause this Deed of Trust to be foreclosed as a mortgage.

7. In the event of the death, incapacity, disability, or resignation of the Trustee, Beneficiary may appoint in writing a successor trustee, and upon the recording of such appointment in the mortgage records of the county in which the Deed of Trust is recorded, the successor trustee shall be vested with all powers of the original trustee. The Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of an action or proceeding in which Grantors, Trustee, or Beneficiary shall be a party unless such action or proceeding is brought by the Trustee.

8. This Deed of Trust applies to, inures to the benefit of, and is binding not only on the parties hereto, but on his/her/their heirs, devisees, legatees, administrators, executors, and assigns. The term Beneficiary shall mean the holder and owner of the note secured hereby, whether or not named as Beneficiary herein.

SAMIA EL-MOSLIMANY

ANN PAXTON EL-MOSLIMANY

STATE OF WASHINGTON }
                     }ss
COUNTY OF KING }

I certify that I know or have satisfactory evidence that SAMIA EL-MOSLIMANY and ANN PAXTON EL-MOSLIMANY are the people who appeared before me, and said individuals acknowledged that they signed this instrument, on oath stated that they are authorized to execute the instrument and acknowledged its execution to be the free and voluntary act of said parties for the uses and purposes mentioned in this instrument.

DATED this 4th day of November, 2016.

Notary Public in and for the State of Washington
Residing at: Seattle
My commission expires: Dec 5, 2017

REQUEST FOR FULL RECONVEYANCE – Do not record. To be used only when note has been paid.

TO: TRUSTEE

The undersigned is the legal owner and holder of the note and all other indebtedness secured by the within Deed of Trust. Said note, together with all other indebtedness secured by said Deed of Trust, has been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, has been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust delivered to you herewith, together with the said Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, all the estate now held by you thereunder.

DATED: _____

Initials: _____
Initials: _____

Page 3 of 3

# Exhibit 12

**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| HAYAT SINDI, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 13-cv-10798-IT** |
| | ) | |
| SAMIA EL-MOSLIMANY and | ) | |
| ANN EL-MOSLIMANY, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF HAYAT SINDI'S MOTION TO COMPEL SAMIA EL-MOSLIMANY TO
RESPOND TO POST-JUDGMENT DISCOVERY REQUESTS**

On November 10, 2016, Plaintiff Hayat Sindi ("Dr. Sindi") served upon Defendants
Samia and Ann El-Moslimany certain post judgment document requests and interrogatories.
After nearly two and a half months, the Defendants have provided no responses and have
produced no documents. Where Ann El-Moslimany is apparently dealing with a serious medical
issue, Dr. Sindi does <u>not</u> seek to compel her compliance with the discovery responses at this
time.[1] However, Samia El-Moslimany should not be able to ignore her discovery obligations in
this case, particularly given the significant judgment which has entered against her along with
her unwillingness to post a bond or other security to secure the judgment, which remains on
appeal. Dr. Sindi respectfully requests that this Court order Samia El-Moslimany to respond to
the nearly three month old discovery requests. As further grounds therefore, Dr. Sindi states as
follows:

---

[1]      Due to Ann El-Moslimany's illness, the Defendants sought and received a ninety (90) day extension to file
their appellate brief.

1

1.      The final judgment in this matter was entered on October 6, 2016 ("the Judgment").  See Amended Final Judgment, ECF No. 223.

2.      On November 4, 2016, Defendants Samia El-Moslimany and Ann El-Moslimany filed a Notice of Appeal, indicating their intent to appeal all aspects of the Judgment in this matter.  See ECF No. 224.

3.      On November 10, 2016, Dr. Sindi served Samia El-Moslimany with post judgment documents requests and interrogatories on November 11, 2016.  See Exhibits A and B.

4.      Samia El-Moslimany has not responded in any way to the document requests or interrogatories.

5.       As a result of his failure to give any response, Samia El-Moslimany has waived any objection she might have to Dr. Sindi's discovery requests.  Krewson v. City of Quincy, 120 F.R.D. 6 (D. Mass. 1988) (holding that objections to discovery request were waived due to failure of party subject to the request to make timely objections).

6.      Since the responses became due, Dr. Sindi's counsel has repeatedly attempted to confer with defense counsel as to when the responses would be provided.  Defense counsel has been unable to commit to any date by which the discovery would be provided.

7.      Dr. Sindi's counsel is aware of Ann El-Moslimany's medical condition and that Samia El-Moslimany claims to be Ann's primary caretaker.  However, the El-Moslimany's current unfortunate situation should not absolve Samia of all obligations associated with this case.  Dr. Sindi has patiently waited for nearly three months for responses to be provided.  Dr. Sindi's counsel has even proposed that responsive documents be provided on a rolling basis so as to ease the burden on Samia.   Nonetheless, no discovery responses have been provided whatsoever and documents have ever been produced.

2

8.     As noted above, the El-Moslimany's have failed to post a bond or other form of security pending their appeal.  Thus, the requested discovery is critical in identifying potential assets available to satisfy the jury's multi-million dollar verdict in the event the jury's verdict is affirmed by the First Circuit.

WHEREFORE, Dr. Hayat Sindi respectfully requests that the Court order (i) that Samia El-Moslimany promptly and fully respond to the document requests and produce responsive documents within 5 business days of this Court's order, (ii) that Dr. Sindi be awarded her costs and attorneys' fees for bringing this motion, and (iii) any further relief that the Court deems just and appropriate.

Respectfully submitted,

HAYAT SINDI

By her attorneys,

/s/ Suzanne Elovecky
David H. Rich (BBO # 634275)
drich@toddweld.com
Suzanne Elovecky (BBO # 670047)
selovecky@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Dated:  January 26, 2017                 617-720-2626

3

## CERTIFICATE OF SERVICE

I, Suzanne Elovecky, hereby certify that this document has been filed through the ECF system, will be sent electronically to the registered participants as identified on the notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

/s/ Suzanne Elovecky
Suzanne Elovecky

Dated:  January 26, 2017

## CERTIFICATE OF COMPLIANCE IN ACCORDANCE WITH LOCAL RULE 7.1

I, David H. Rich, hereby certify that I have attempted in good faith to resolve the issues set forth in this motion to compel with defense counsel.  In particular, I have spoken on two occasions to defense counsel with regard to the Defendants' failure to respond to the pending discovery.  In my initial conversation with Defendants' new counsel in December, I informed him that I understood he was just getting up to speed on the case and that I was prepared to provide him with a little more time serve discovery responses.  I again spoke with defense counsel in January and inquired as to the outstanding discovery.  Defense counsel indicated that Ann El-Moslimany was ill and that Samia El-Moslimany was caring for her mother.  I expressed my sympathy and explained that I was willing to forgo obtaining discovery from Ann at this time and would work with him to limit the burdens on Samia.  I suggested that Samia produce documents on a rolling basis over time.  Defense counsel appreciated the suggestion and stated that my proposal was reasonable.  Despite my willingness to cooperate, defense counsel has yet to produce any responses and has yet to even commit to a schedule.  I also forwarded emails to defense counsel on January 3, 5, 18 and 20 inquiring about the outstanding discovery.  Despite my attempts, defense counsel has yet to produce any discovery responses (or commit to a date by which responses would be provided).

/s/ David H. Rich
David H. Rich

Dated:  January 26, 2017

4

# Exhibit 13

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **HAYAT SINDI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 13-cv-10798-IT** |
| ) | |
| **SAMIA EL-MOSLIMANY and** ) | |
| **ANN EL-MOSLIMANY,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**PLAINTIFF HAYAT SINDI'S MOTION TO COMPEL SAMIA EL-MOSLIMANY TO
RESPOND TO POST-JUDGMENT DISCOVERY REQUESTS**

On November 10, 2016, Plaintiff Hayat Sindi ("Dr. Sindi") served upon Defendants

Samia and Ann El-Moslimany certain post judgment document requests and interrogatories.

After nearly two and a half months, the Defendants have provided no responses and have

produced no documents.  Where Ann El-Moslimany is apparently dealing with a serious medical

issue, Dr. Sindi does not seek to compel her compliance with the discovery responses at this

time.[1]  However, Samia El-Moslimany should not be able to ignore her discovery obligations in

this case, particularly given the significant judgment which has entered against her along with

her unwillingness to post a bond or other security to secure the judgment, which remains on

appeal.  Dr. Sindi respectfully requests that this Court order Samia El-Moslimany to respond to

the nearly three month old discovery requests.   As further grounds therefore, Dr. Sindi states as

follows:

---

[1]      Due to Ann El-Moslimany's illness, the Defendants sought and received a ninety (90) day extension to file
their appellate brief.

1.      The final judgment in this matter was entered on October 6, 2016 ("the Judgment").  <u>See</u> Amended Final Judgment, ECF No. 223.

2.      On November 4, 2016, Defendants Samia El-Moslimany and Ann El-Moslimany filed a Notice of Appeal, indicating their intent to appeal all aspects of the Judgment in this matter.  <u>See</u> ECF No. 224.

3.      On November 10, 2016, Dr. Sindi served Samia El-Moslimany with post judgment documents requests and interrogatories on November 11, 2016.  <u>See</u> Exhibits <u>A</u> and <u>B</u>.

4.      Samia El-Moslimany has not responded in any way to the document requests or interrogatories.

5.       As a result of his failure to give any response, Samia El-Moslimany has waived any objection she might have to Dr. Sindi's discovery requests.  <u>Krewson v. City of Quincy</u>, 120 F.R.D. 6 (D. Mass. 1988) (holding that objections to discovery request were waived due to failure of party subject to the request to make timely objections).

6.      Since the responses became due, Dr. Sindi's counsel has repeatedly attempted to confer with defense counsel as to when the responses would be provided.  Defense counsel has been unable to commit to any date by which the discovery would be provided.

7.      Dr. Sindi's counsel is aware of Ann El-Moslimany's medical condition and that Samia El-Moslimany claims to be Ann's primary caretaker.  However, the El-Moslimany's current unfortunate situation should not absolve Samia of all obligations associated with this case.  Dr. Sindi has patiently waited for nearly three months for responses to be provided.  Dr. Sindi's counsel has even proposed that responsive documents be provided on a rolling basis so as to ease the burden on Samia.   Nonetheless, no discovery responses have been provided whatsoever and documents have ever been produced.

2

8.     As noted above, the El-Moslimany's have failed to post a bond or other form of security pending their appeal.  Thus, the requested discovery is critical in identifying potential assets available to satisfy the jury's multi-million dollar verdict in the event the jury's verdict is affirmed by the First Circuit.

WHEREFORE, Dr. Hayat Sindi respectfully requests that the Court order (i) that Samia El-Moslimany promptly and fully respond to the document requests and produce responsive documents within 5 business days of this Court's order, (ii) that Dr. Sindi be awarded her costs and attorneys' fees for bringing this motion, and (iii) any further relief that the Court deems just and appropriate.

Respectfully submitted,

HAYAT SINDI

By her attorneys,

/s/ Suzanne Elovecky
David H. Rich (BBO # 634275)
drich@toddweld.com
Suzanne Elovecky (BBO # 670047)
selovecky@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Dated:  January 26, 2017                     617-720-2626

3

**CERTIFICATE OF SERVICE**

I, Suzanne Elovecky, hereby certify that this document has been filed through the ECF system, will be sent electronically to the registered participants as identified on the notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

/s/ Suzanne Elovecky
Suzanne Elovecky

Dated:  January 26, 2017

**CERTIFICATE OF COMPLIANCE IN ACCORDANCE WITH LOCAL RULE 7.1**

I, David H. Rich, hereby certify that I have attempted in good faith to resolve the issues set forth in this motion to compel with defense counsel.  In particular, I have spoken on two occasions to defense counsel with regard to the Defendants' failure to respond to the pending discovery.  In my initial conversation with Defendants' new counsel in December, I informed him that I understood he was just getting up to speed on the case and that I was prepared to provide him with a little more time serve discovery responses.  I again spoke with defense counsel in January and inquired as to the outstanding discovery.  Defense counsel indicated that Ann El-Moslimany was ill and that Samia El-Moslimany was caring for her mother.  I expressed my sympathy and explained that I was willing to forgo obtaining discovery from Ann at this time and would work with him to limit the burdens on Samia.  I suggested that Samia produce documents on a rolling basis over time.  Defense counsel appreciated the suggestion and stated that my proposal was reasonable.  Despite my willingness to cooperate, defense counsel has yet to produce any responses and has yet to even commit to a schedule.  I also forwarded emails to defense counsel on January 3, 5, 18 and 20 inquiring about the outstanding discovery.  Despite my attempts, defense counsel has yet to produce any discovery responses (or commit to a date by which responses would be provided).

/s/ David H. Rich
David H. Rich

Dated:  January 26, 2017

Case 19-01116-CMA   Doc 1-1   Filed 09/12/19   Ent. 09/12/19 16:56:28   Pg. 111 of 164

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **HAYAT SINDI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 13-cv-10798-IT** |
| | ) | |
| **SAMIA EL-MOSLIMANY and** | ) | |
| **ANN EL-MOSLIMANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**HAYAT SINDI'S POST JUDGMENT**
**INTERROGATORIES PROPOUNDED**
**UPON SAMIA EL-MOSLIMANY**

Pursuant to Fed. R. Civ. P. 69(a)(2), Hayat Sindi hereby request that Samia El-Moslimany answer the following interrogatories under oath within thirty (30) days of service hereof or such shorter time as the Court may order.

DEFINITIONS AND INSTRUCTIONS

1.     As used herein, "Samia El-Moslimany" shall mean the Defendant Samia El-Moslimany, any and all of her partners, entities in which she owns a significant or controlling interest, her attorneys, accountants, members of her family, and any other person(s) or entity(ies) purporting to act on his behalf or for her benefit (including but not limited to trusts).

2.     As used herein, "you" shall mean Samia El-Moslimany.

3.     As used herein, the term "documents" means any and all things on or in which words, pictures, or other information is temporarily or permanently stored or contained, in the possession, custody or control of either or both Defendants. "Documents" shall include without limitation, all correspondence, e-mails, fax coversheets, letters, notes, minutes, telegrams, memoranda or notations of telephone conversations, conferences or meetings, reports, files, diaries, photographs, invoices, bills, sketches, calculations, test results, computer printouts, tables, graphs, charts, schedules and any drafts or copies of any of the foregoing. A draft or non-identical copy is a separate document within the meaning of this term.

4.      As used herein, the term "person" means the plural as well as the singular and includes any natural person and a firm, corporation, association or partnership, governmental entity, or other form of legal entity unless the context indicates otherwise.

5.      As used herein, the term "concerning" means constituting, containing, embodying, describing, evidencing, mentioning, referencing, relating to, analyzing, reflecting, illustrating, depicting, or summarizing.

6.      The term "communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).  Further, "communication" includes the transmittal of information by any and all means of transmittal, whether written, oral, electronic, or otherwise.

7.      As used herein when referring to documents, "identify" shall mean to state, to the extent known, (a) type of document; (b) general subject matter; (c) date of the document; and (d) to identify the author(s), addressee(s), and recipient(s) of the document and any copy thereof.

8.      As used herein, when referring to persons or entities, "identify" shall mean to give, to the extent known, (a) name; (b) home address; (c) place of employment and business address; and (d) any affiliation/relationship with a party to this action.

9.      As used herein, when referring to conversations and/or meetings, "identify" shall mean to give, to the extent known,

(a)      the date and time of each such conversation/meeting and whether it was face-to-face, electronic, telephonic or by some other medium, identifying that medium;

(b)      the place where such conversation/meeting occurred;

(c)      the name, address and position of all other persons present during such conversations/meetings;

(d)      the substance of each conversation/meeting, in as much detail as you can recall, including what you said and what was said by each other person present, identifying the speaker in each case;

(e)      identify each person with knowledge thereof; and

(f)      identify any and all documents concerning any such conversations/meetings.

10.      When an interrogatory calls for you to "state the basis" of or for a particular claim, assertion, allegation, or contention, you shall:

(a)      identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the

party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b)    identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c)    state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

(d)    state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

11.    The following rules of construction apply to all discovery requests:

(a)    The terms "all" and "each" shall be construed as "all and each";

(b)    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope; and

(c)    The use of the singular form of any word includes the plural and vice versa.

12.    No information or document shall be withheld from discovery based on any claim or belief by you that such information or document already is in the possession of Hayat Sindi.

13.    In answering these interrogatories, you must include both information of which you have personal knowledge or which is available to you *and* information obtainable by reasonable investigation.  This includes information available to or in the possession of any person acting on your behalf of or under your control.

14.    These interrogatories are continuing and require supplemental response and production.

15.    These requests seek materials and information not only within the personal possession of Samia El-Moslimany, but also those materials and information in the custody or control of Samia El-Moslimany.  This would include, but is not limited to those materials and information in the custody or control of lawyers, accountants, financial advisors and other third parties.

## INTERROGATORIES

### INTERROGATORY NO. 1

State your full name, date of birth, residential address, occupation(s) and business addresses.

### INTERROGATORY NO. 2

From January 1, 2006 to the present, please list all real properties you hold or have held any interest in, whether foreign or domestic, whether held individually, jointly, in the entirety or in common, by another for your benefit, in your name as trustee, beneficiary, guardian or custodian for another, or as a member, stockholder, shareholder, owner, principal of a real estate trust, limited partnership, joint venture, unincorporated association, holding company, an LLC, a corporation or any other legal entity.  For each piece of property please list:

    a.    Address;

    b.    Date of acquisition and purchase price;

    c.    Name in which title was taken;

    d.    Your percentage ownership interest;

    e.    Source of monies used as down payment and identification of account on which monies were drawn;

    e.    Date of sale and sales price if applicable;

    f.    Contributions made by you to acquisition, preservation, mortgage and maintenance costs;

    g.    Present fair market value and your basis for determination of same (including any appraisal done on the property, the identity of the appraiser and the basis of the appraisal);

    h.      Any mortgage or lien balances encumbering the property and names and

                addresses of mortgagor or lien holder.

## INTERROGATORY NO. 3

Since January 1, 2006 have you been a member, shareholder, owner or stockholder in any

business or professional enterprises including without limitation, partnerships, LLC,

unincorporated entities, limited partnerships, holding companies, corporations, associations, joint

ventures, real estate trusts, trusts and sole proprietorships, whether foreign or domestic?  If so,

for each business state:

    a.      Name and address of the entity; and your position and/or office therein.

    b.      The form of business organization and extent of your ownership interest including

                capital investment;

    c.      The terms of your compensation including date and amounts of payments actually

                made and/or credited to you or which you have a right to receive.

    d.      Any change(s) in the form of organization or your interest therein, including the

                consideration paid or received for such changes.

    e.      What documents exist, if any, reflecting the existence or ownership interest of

                the business or professional enterprises.

## INTERROGATORY NO. 4

Please identify any bank, brokerage, financial or other account held with any financial or

lending institution, held by you, including but not limited to account held jointly or solely or on

your behalf; accounts held by another for your benefit, accounts held in your name as trustee,

guardian or custodian for another; accounts held as a trust in which you are a trustee or

beneficiary; accounts held in an account in which you or your nominee had or has an interest,

and/or accounts on which you were authorized to draw or deposit funds at any time from January 1, 2006 to the present including all such accounts located inside or outside the United States.

For each account, please identify the name of the account, the account number, the name and address of the institution in which the account is or was held; the date the account was opened, the date the account was closed (if any), the current balance of the account (if any), and the date of the last withdrawal from the account.

## INTERROGATORY NO. 5

Identify and list all deferred-compensation plans or arrangements in which you have been or are now an active participant and under which you have actual or potential rights to future benefits, including but not limited to, the following:

  a.  Pension, defined benefit, defined contribution, or stock bonus plans which qualify for special tax treatment by virtue of meeting the requirements of section 401(a) of the Internal Revenue Code (IRC), including any plans containing cash- or-deferred arrangements described in IRS section 401(k), including any so-called "Keough" plans.

  b.  Annuity plans described in IRS section 403(a)

  c.  "Tax-sheltered annuity" plans described in IRS section 403(b).

  d.  Individual retirement accounts or annuities (IRA's) or Simplified Employee Pensions (SEP's) described in IRS section 408.

  e.  Excess-benefit plans, as defined by section 3(36) of the Employee Retirement Income Security Act of 1974 (ERISA).

f.    Deferred compensation plans of any kind, whether written or unwritten, whether or not funded through dedicated investments, and whether or not financed by reduction of the participant's regular salary or wages.

## INTERROGATORY NO. 6

If, since January 1, 2006, you have received any gift, legacies, devises or inheritances, or if you are, have been, or will become a beneficiary of any trusts or estates, please state:

a.    The amount of value of each such gift, legacy, devise or inheritance;

b.    The source from which each such gift, legacy, devise or inheritance was received;

c.    Date when each such gift, legacy, devise or inheritance was received;

d.    Name of the donor, settlor, testator or intestate who created such gift, trust or estate;

e.    The amount of value of the property received by you from each such gift, trust or estate during said period;

f.    The amount of any fiduciary fees which you have received or are entitled to receive.

## INTERRGOATORY NO. 7

Have you personally prepared and issued or had prepared and issued for your behalf, any financial or net worth statement reflecting your assets, liabilities and/or income from January 1, 2006 to the present whether for your own use or for any other purpose?

If your answer is in the affirmative, please set forth:

a.    The purpose for which each such statement was prepared and issued;

b.    Date each such statement was issued;

c.  The name and address of each person, bank, firm, corporation, partnership or other entity to whom each was issued;

d.  A copy of each such statement.

## INTERROGATORY NO. 8

From January 1, 2006 to the present, have you or has anyone on your behalf either individually or jointly maintained any safety deposit boxes, vaults or safes, or other depositories for safekeeping and, if so, please state the location and identity of each such depository and the identities of other individuals having access to same.  Please list the contents of such depositories presently contained therein or moved at any time therefrom.

## INTERROGATORY NO. 9

Please list and give account numbers for all credit cards and/or charge accounts previously or presently held or utilized by you from January 1, 2006, to the present, either in your name individually, jointly with another person or business entity, or in the name of any other person or business entity.

## INTERROGATORY NO. 10

If you own or have an interest in, or ever owned or had an interest in any cash, bonds, bearer bonds, debentures, stock, stock options, phantom shares of stock, incentive shares of stock, partnerships, mutual funds, brokerage accounts, custodial accounts, investment funds or other investment or like intangible asset, whether foreign or domestic, (hereinafter referred to generally as 'securities'), in your name alone, jointly with another person or entity, in someone else's name for your benefit, as trustee or beneficiary of any trust, or in the name of any nominee, since January 1, 2006, please state:

1)  the name and type of each security;

2)      the number of shares or stated dollar amount of each security;

3)      the date it was acquired by you;

4)      the amount you paid  for it;

5)      the source of funds used for the acquisition of it;

6)      its current market value;

7)      the form of documentation you maintain of the asset (such as stock certificate);

8)      the amount of dividends distributed quarterly/annually;

9)      the current location of the documentation; and

10)     if your answer to this interrogatory includes intangible assets which you no longer own, state how each such property or interest therein was disposed of; when it was disposed of and what proceeds you received from the disposition, giving their current location and value.

## INTERROGATORY NO. 11

Please list in itemized detail your current indebtedness and include the following information:

a.      The name of the bank or lending institution and/or creditors which made the loan(s);

b.      The address of all such creditors and institutions;

c.      The name of each bank officer or other individual with whom you dealt;

d.      Whether a loan application was submitted;

e.      The loan number(s); and

    f.      Individuals who have loaned you money, including friends, family members and/or business associates, and whether you signed an agreement to repay the loan.

## INTERROGATORY NO. 12

Since January 1, 2006, have you been the settlor, trustee or beneficiary of any trusts, whether foreign or domestic?  If your response is in the affirmative, please set forth:

    a.      Name of trust and date trust was created;

    b.      Names and addresses of trustees;

    c.      Copy of trust instrument and tax returns filed by said trust from January 1, 2004 to the present;

    d.      Names, addresses and relationships of those persons having any form of beneficial interest under said trust(s).

## INTERROGATORY NO. 13

Since January 1, 2006, please identify any asset you own or have owned, whether foreign or domestic, whether in your name alone, jointly with another person or entity, in someone else's name for your benefit, as trustee or beneficiary of any trust, or in the name of any nominee, with a value in excess of $2,000.  This request would include, but is not necessarily limited to, items such as automobiles, motorcycles, horses, boats, stocks, bonds, securities, stock options, commodities contracts, gold, silver or any other precious metals or gems, gas, oil or mineral rights or leases, artwork worth, jewelry, antiques, oriental rugs, or any item of personal furnishings, furs, coins, stamps, other collectibles, recreational equipment, real property and foreign currencies.

For each item, please describe the item, set forth its current location, the approximate value of the item, if you no longer own the item, please identify the person or entity to whom you sold the item, the date of sale and the sale price for the item.

You may exclude from this response any piece of property specifically referenced elsewhere in your Interrogatory Responses.

## INTERROGATORY NO. 14

Please set forth an itemized list of expenditures made by you for acquisition, preservation, maintenance, appreciation, furnishings, renovations and/or construction at the property located at the properties listed in Interrogatory No. 2 above, including the nature of the expenditure, the amount of each expenditure, and the source of the funds used by you to pay for each such expenditure.

Respectfully submitted,

HAYAT SINDI

By her attorneys,

/s/ Suzanne Elovecky
David H. Rich (BBO # 634275)
drich@toddweld.com
Suzanne Elovecky (BBO # 670047)
selovecky@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
617-720-2626

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on 11/10/16.

Dated:  November 10, 2016

# Exhibit 14

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HAYAT SINDI, | : | CIVIL ACTION NO. 13-cv-10798-IT |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SAMIA EL-MOSLIMANY and | : | |
| ANN EL-MOSLIMANY, | : | |
| | : | |
| Defendants. | : | FEBRUARY 10, 2017 |

### MOTION TO STAY WITHOUT BOND[1]

Pursuant to Rule 62(f) of the Federal Rules of Appellate Procedure, the Defendants move to stay this matter – without bond – pending the outcome of the underlying appeal.  The Defendants maintain they are entitled to such a stay, which would, *inter alia*, prevent the Plaintiff from conducting post-judgment discovery until the resolution of the now-pending appeal.

Given the Plaintiff's previous representations to this Court and the Defendants concerning her intentions to register the underlying judgment in the Defendants' home state of Washington, and the subsequent reliance by the Court and Defendants thereon, the Plaintiff is now estopped from requiring the Defendants to post a bond to stay this matter pending appeal.  Accordingly, the Defendants ask this Court to enter an Order, pursuant to Rule 62(f) of the Federal Rules of Appellate Procedure, staying any efforts by the Plaintiff to explore any alleged entitlement to enforce such Judgment while this matter is pending before the Court of Appeals for the First Circuit.

---

[1] On this date, the Defendants are filing an Objection to Plaintiff's Motion To Compel Responses to Post-Judgment Discovery Requests, which they incorporate herein.

## Background

On November 15, 2016, the Plaintiff filed a Motion for Certified Copy of Judgment with this Court.  (Docket No. 228.)  In that Motion, the Plaintiff represented that she intended "to take all legal action available to her to enforce the Judgment."  (*Id.* at ¶ 6.)  Further, the Plaintiff referred to trial testimony by the Defendants that they do no maintain a residence in Massachusetts; rather, they own a home together in Burien, Washington, which is their residence.  (*Id.* at ¶ 7.)  In her Motion, the Plaintiff referred expressly to registering the Judgment in Washington.  (*See id.* at ¶ 8.)

Based on the Plaintiff's representation that she was going to take the copy of the Certified Judgment, which she was requesting, and register it in their home state of Washington, the Defendants took no action in response to the Plaintiff's Motion. Subsequently, this Court granted the Plaintiff's Motion as unopposed, and issued a Certified Copy of the Judgment.

**I.    Given her prior representations, the Plaintiff is judicially estopped from contesting the Defendants' efforts to seek a stay of these proceedings, pending the outcome of the appeal, without the requirement of a bond.**

The doctrine of judicial estoppel provides that, where a party takes one position during a legal proceeding, and succeeds with regard to that position, she may not "thereafter, simply because [her] interests have changed, assume a contrary position, especially if it be to the prejudice to the part who has acquiesced in the position" she formerly took.  *In re Nexium (Esomeprazole) Antitrust Litig.*, 309 F.R.D. 107, 129 (D. Mass. 2015) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted)).  This doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Id.*  The purpose of this equitable doctrine "is to protect the

2

integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. at 749-50).

In analyzing a claim of judicial estoppel, courts consider whether: (1) the party's later position is inconsistent with its earlier position; (2) the party succeeded in persuading the court to accept that party's earlier position, the court's "acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled"; and (3) the party seeking to assert an inconsistent position would realize an "unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. at 750-51).

Here, all of the elements necessary to justify the imposition of judicial estoppel are present. First, the Plaintiff's failure or refusal to register the Judgment is inconsistent with her earlier representation that she would do so. Second, the Plaintiff succeeded in persuading this Court (and the Defendants) to accept her representation, as the Court issued the Certified Judgment. Third, the Plaintiff's reference, in her Motion To Compel, to the Defendants' failure to post a bond or other form of security; (Mot. at ¶ 8.); is evidence of the unfair advantage the Plaintiff would gain, and unfair detriment the Defendants would suffer, respectively, if the Plaintiff is not estopped.

## II. Insofar as the Plaintiff could procure a lien on the home of the Defendants by minor ministerial act, such a minor burden should not preclude a stay under Rule 62(f).

Additionally, the Plaintiff's affirmative, and tactical, decision not to convert the Judgment into a lien should not allow her to strong-arm the Defendants into having to post an appellate bond to obtain a stay. Indeed, the First Circuit has explained its view that, "where a lien can be procured by minor ministerial acts, this minor burden on the

judgment-creditor should not preclude a stay under Rule 62(f)." *Rodriguez-Vazquez v. Lopez-Martinez*, 345 F.3d 13, 14 (1st Cir. 2003).[2]  In *Rodriguez-Vazquez*, the plaintiffs-appellees made the unrefuted assertion that they could not procure a lien without paying "a very large fee" to register the underlying judgment.  *Id.*  That is not the case here.

The Defendants' home is located in King County, Washington.  It is ministerial and inexpensive to file a foreign judgment in King County, costing only $240,[3] which is a relatively nominal amount, and a fraction of the Judgment the Plaintiff seeks to enforce. (*See* King County Fee Schedule (attached hereto as **Exhibit A**).)  Furthermore, insofar as, upon filing such a judgment, the creditor can procure a lien on the Defendants' real property at minimal expense through a minor ministerial act, a stay under Rule 62(f) is warranted.  *See Rodriguez-Vazquez*, 345 F.3d at 14.

### Conclusion

Wherefore, for the foregoing reasons, the Defendants ask this Court to enter a stay, without the requirement that the Defendants post a bond, while the case is pending before the Court of Appeals for the First Circuit.

---

[2] Pursuant to Rule 62(f) of the Federal Rules of Appellate Procedure, a judgment debtor has the right to a stay of execution "if a judgment is a lien on the judgment debtor's property under the law of the state where the court is located."  Massachusetts law, which governs this situation, insofar as this Court is located in Massachusetts, provides that, "the taking of an appeal from a judgment shall stay execution upon the judgment during the pendency of the appeal."  Mass. R. Civ. P. 62(d).  Rule 62(d) of the Civil Rules of Procedure does not require the posting of a bond.

[3] King County, Superior Court & Clerk's Office Fee Information, http://www.kingcounty.gov/courts/clerk/fees.aspx (last visited Feb. 10, 2017).

Respectfully submitted by,

DEFENDANTS,
SAMIA EL-MOSLIMANY and
ANN EL-MOSLIMANY


_____s/ John A. Kiernan_____
John A. Kiernan (BBO #271020)
jkiernan@bonnerkiernan.com
Robert E. Koosa (BBO #671361)
rkoosa@bonnerkiernan.com
Bonner Kiernan Trebach & Crociata, LLP
200 Portland Street
Boston, MA 02114
Tel: (617) 426-0100

## **CERTIFICATION**

I hereby certify that, on this date, a copy of foregoing **Motion To Stay Without Bond** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/ John A. Kiernan_____

# Exhibit 15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HAYAT SINDI, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-10798-IT |
| | * | |
| SAMIA EL-MOSLIMANY and ANN | * | |
| EL-MOSLIMANY, | * | |
| | * | |
| Defendants. | * | |

ORDER

February 28, 2017

TALWANI, D.J.

Before the court are Plaintiff's Motion to Compel [#249] and Defendants' Motion to Stay Without Bond [#255].

On October 6, 2016, the court entered an Amended Final Judgment in this matter awarding Plaintiff Hayat Sindi compensatory and special damages, including pre- and post-judgment interest. [#223]. Pursuant to Plaintiff's unopposed motion [#228] and for good cause shown, the court directed the clerk to issue a certified copy of this judgment. [#233].

In order to recover her judgment, Plaintiff has sought post-judgment discovery pertaining to Defendants' assets [#249-1 & #249-2]. Having received no response from Defendants, Plaintiff seeks an order compelling Defendant Samia El-Moslimany to answer the interrogatories and produce the requested documents [#249].[1] Defendants have opposed [#254] and have independently sought an order from this court staying, without bond, this matter, including not

_____

[1] Plaintiff states that she does not seek to compel responses from Defendant Ann El-Moslimany at this time in deference to her health issues.

only the judgment but also post-judgment discovery pending appeal [#255]. Defendants proffer an identical argument in their opposition and motion: that, because Plaintiff allegedly evinced her intent to convert her judgment into a lien on Defendants' Washington property, she is both bound by that intention and precluded from any other means of securing her judgment pending appeal. This argument is meritless.

Rule 62 provides a variety of scenarios in which a stay of execution or any post-judgment enforcement proceedings is necessary or appropriate. None are germane here.[2] Specifically, Defendants rely on Rule 62(f), which states that when "a judgment is a lien on the judgment debtor's property under the law of the state where the court is located, the judgment debtor is entitled to the same stay of execution the state court would give." Defendants provide no authority for the conclusion that the judgment here, entitling Plaintiff to monetary damages, is "a lien on the judgment debtor's property" under Massachusetts law. And while the First Circuit made passing reference concerning Rule 62(f)'s applicability when liens are easily obtained via facile ministerial acts, that dicta was followed with some support for the notion that Rule 62(f) cannot allow a stay when the lien would fail to satisfy the entire judgment, see Rodriguez-Vazquez v. Lopez-Martinez, 345 F.3d 13, 13-14 (1st Cir. 2003), particularly if the inadequate lien is not a lien on all of the judgment-debtor's property. Simply put, that decision does not compel a Rule 62(f) stay in the matter before this court.

Further, Defendants' core estoppel argument is without support in the record. Nothing in Plaintiff's Motion for Certified Copy [#228], which is the only document Defendants cite to support this argument, evinces any intent on Plaintiff's part to foreclose any means of executing her judgment—and the court did not grant this relief in reliance on any such representation. Thus

---

[2] Defendants may obtain a stay by posting a bond pursuant to Rule 62(d), but have not done so.

2

nothing before this court precludes Plaintiff's right to seek post-judgment discovery pursuant to Rule 69(a)(2).

Accordingly, Plaintiff's Motion to Compel [#249] is ALLOWED as to Samia El-Moslimany, and Defendants' Motion to Stay Without Bond [#255] is DENIED. Defendant Samia El-Moslimany is hereby ORDERED to respond to Plaintiff's previously-served post-judgment request for production of documents, to produce responsive documents, and to answer Plaintiff's previously-served post-judgment interrogatories, within 10 days of this order.

IT IS SO ORDERED.

Date: February 28, 2017                                     /s/ Indira Talwani
                                                           United States District Judge

3

# Exhibit 16



**GLOBAL LINK LANGUAGE SERVICES, INC**
**YOUR LINK TO THE WORLD**
71 Commercial Street, #218
Boston, MA 02109
(617) 451-6655 Telephone
(617) 451-6644 Facsimile
www.languagetranslate.com
info@languagetranslate.com

### CERTIFICATION

**Date: August 22,2019**

We hereby certify and confirm that the below mentioned document is a true and accurate **English translation** of the **Arabic document** presented to us, and has been translated to the best of our professional ability.

**Page 12 of Samia Document 1**

Sincerely,

Anthony Federico

Global Link Language Services, Inc.

Notary Public: Marie Delaney

My commission expires on: 01/28/2021

**In the Name of Allah, the Most Merciful, Most Gracious**

Kingdom of Saudi Arabia

Ministry of Justice                    [Emblem of Ministry of Justice]

    [277]

**Second Notary Public in Riyadh**                    **Acknowledgment No.: 371636750**

                                              **Date: 29 Dhu al-Qadah 1437 AH**

### Acknowledgment of Debt

Praise be to Allah alone and peace and blessings be upon the Last prophet. And thereafter:

In my presence, I, Attaib ibn Abdallah Al-Suhaibani, Head of Second Notary Public in Riyadh Appeared before me, in full legal capacity, the following:

1- First party (Creditor), Aziza bint Mohammed bin Abdel Aziz Yousef, a Saudi national, Civil Status Register No. 1046253027

2- Second party (Debtor) Samia Mohammed Ahmed El-Moslimany, a Saudi national, Civil Status Register No. 1136574074

After being legally identified by:

1- Abdel Aziz Hamad Abdallah Al Salih, a Saudi national, Civil Status Register No. 1059383164.

The debt was acknowledged as follows:

Debt type: Financial, in the sum of 1,300,000 (one million three hundred thousand) riyals and shall be paid in instalments starting from 20 Jumada al-Akhirah 1434 AH.

Interest-free Loan to assist her in running her business, paying lawyers' fees due to cases filed against her, and to help her in the livelihood after her separation from her husband.

Due date: no specific time. It may be paid whenever available.

Payment options: Installments or in full.

The Debtor acknowledged the receipt of aforementioned debt and committed to pay on the debt's due date.

In witness thereof, the document was certified and signed on 29 Dhu al-Qadah 1437 AH. Peace be upon our Prophet Muhammad and on all his family and his Companions.


Head of Notary Public                    Official Stamp

Attaib ibn Abdallah Al-Suhaibani

*Aziza Mohammed Yousef* [signature]

*Abdel Aziz Hamad Al Salih* [signature] *29 Dhu al-Qadah 1437 AH*

*Samia Mohammed El-Moslimany* [signature]

2086

Note: Any scratch or change to this Acknowledgment renders it void. The Acknowledgment is effective unless otherwise

Government Press Department: [illegible]        This form is designed for computer use [illegible]

       Form No: [illegible]

# Exhibit 17

# PROMISSORY NOTE

September __1__, 2016,

Seattle, Washington

FOR VALUE RECEIVED, Samia El-Moslimany, a married person, (hereinafter "Borrower"), currently residing at 2655 SW 151 Place, Burien, Washington 98166, promises to pay to the order of the Aziza M. Yousef (hereinafter "Lender") the sum of THREE HUNDRED FORTY-SIX THOUSAND SIX HUNDRED AND SIXTY-SIX DOLLARS US ($346,666.00) with ZERO (0%) interest per annum accruing on the unpaid principal, unless changed by subsequent mutual agreement of both parties in writing. All outstanding amounts are due and owing in full on or before the date of Maturity as set forth in Provision 2, below.

Borrower and Lender acknowledge that they execute the instant Note with the intent that it supplements and sets forth additional, more detailed terms, than the previously executed Promissory Note (Ministry of Justice, Saudi Arabia, Document #37163750, 29/11/1437 Hijra), entered into between the Parties. This Promissory Note is attached hereto as EXHIBIT "A" for reference.

1. **PAYMENT PLACE.** Payment shall be made to Lender at her place of residence or at such other place as Lender may designate in writing by notice to Borrower. Payment shall be submitted to the following address:

   > P.O. Box 54301
   > Riyadh 11415
   > Saudi Arabia

2. **MATURITY.** The date of Maturity shall be the final day of the three hundred and sixtieth (360) month, or thirty (30) years, running from the above-referenced date of execution of this Note.

3. **WAIVERS.** Borrower and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

4. **GIVING OF NOTICES.** Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first-class mail to Borrower at the property address above or at a different address if Borrower has given Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by first-class mail to Lender at the address stated above or at a different address if Borrower is provided written notice of that address.

5. **OBLIGATIONS OF PERSONS UNDER THIS NOTE.** If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is guarantor, surety or endorser of this Note is also obligated pursuant to the terms of this Note. Any person, who takes over these obligations, including the obligations of a guarantor surety or endorser of this Note, is also obligated perform pursuant to all terms contained in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

6. **CHOICE OF LAW.** This Note shall be governed and enforceable pursuant to the applicable laws of the State of Washington.

7. **SECURITY. This Note shall be security by a Deed of Trust, recorded against the following property:**

   LOT 12 OF SEAHURST-WEST, AS PER PLAT RECORDED IN VOLUME 80 OF PLATS, PAGE 45, RECORDS OF KING COUNTY AUDITOR;

   SITUATE IN THE CITY OF BURIEN, COUNTY OF KING, STATE OF WASHINGTON.

   Commonly known as: 2655 SW 151 Place, Burien, Washington 98166.

8. **TERMINATION UPON DEATH.** Lender and Borrower expressly agree that this agreement, and all rights and duties pursuant hereto, immediately terminates upon the death of either party and is non-transferrable to the heirs, beneficiaries or assignees of either party.

Borrower and Lender each acknowledge that they execute this Note as a principal and not as a surety.

Principal and interest (if any) shall be payable in lawful money of the United States.

If legal action must be instituted to enforce any terms of this Note, the prevailing party agrees to pay such sum as the court may fix toward reasonable attorney's fees.

Dated this __O 2__ day of ~~September~~ October, 2016.

**BORROWER:**

Salhia El-Moslimany

**LENDER:**

Aziza M. Yousef

Kingdom of Saudi Arabia
City of Riyadh
Embassy of the United State of America

Before me, the undersigned Notary Public in and for said city and country, did personally appear Aziza M. Yousef (Lender) and signed this Promissory Note as her free and voluntary act and deed.

NOTARY PUBLIC

Kimberly Gudenkauf
Consular Associate
Embassy of the United States of America

**BORROWER:**

Samia El-Moslimany

**STATE OF WASHINGTON**

Before me, the undersigned Notary Public in and for said state and county, did
personally appear Samia El-Moslimany (Borrower) and signed this Promissory Note as
her free and voluntary act and deed.

**NOTARY PUBLIC**                                    11/15/2016



GEORGE M. ARGO
COMMISSION EXPIRES
NOTARY
PUBLIC
9-19-19
STATE OF WASHINGTON

# Exhibit 18

# PROMISSORY NOTE

May 28, 2017
Riyadh, Saudi Arabia

 FOR VALUE RECEIVED, Samia El-Moslimany, a married person, (hereinafter "Borrower"), currently residing at 2655 SW 151 Place, Burien, Washington 98166, promises to pay to the order of the Aziza M. Yousef (hereinafter "Lender") the sum of ONE HUNDRED THOUSAND DOLLARS US ($100,000.00) with ZERO (0%) interest per annum accruing on the unpaid principal, unless changed by subsequent mutual agreement of both parties in writing. All outstanding amounts are due and owing in full on or before the date of Maturity as set forth in Provision 2, below.

 Borrower and Lender acknowledge that they execute the instant Note with the intent that it supplements and sets forth additional, more detailed terms in a Promissory Note to be executed in Riyadh, Saudi Arabia by the Ministry of Justice, Saudi Arabia,

1. **PAYMENT PLACE.** Payment shall be made to Lender at her place of residence or at such other place as Lender may designate in writing by notice to Borrower. Payment shall be submitted to the following address:

  P.O. Box 54301
  Riyadh 11415
  Saudi Arabia

2. **MATURITY.** The date of Maturity shall be the final day of the three hundred and sixtieth (360) month, or thirty (30) years, running from the above-referenced date of execution of this Note.

3. **WAIVERS.** Borrower and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

4. **GIVING OF NOTICES.** Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first-class mail to Borrower at the property address above or at a different address if Borrower has given Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by first-class mail to Lender at the address stated above or at a different address if Borrower is provided written notice of that address.

5. **OBLIGATIONS OF PERSONS UNDER THIS NOTE.** If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is guarantor, surety or endorser of this Note is also obligated pursuant to the terms of this Note. Any person, who takes over these obligations, including the obligations of a guarantor surety or endorser of this Note, is also obligated perform pursuant to all terms contained in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

6. **CHOICE OF LAW.** This Note shall be governed and enforceable pursuant to the applicable laws of the State of Washington.

7. **SECURITY. This Note shall be security by a Deed of Trust, recorded against the following property:**

LOT 12 OF SEAHURST-WEST, AS PER PLAT RECORDED IN VOLUME 80 OF PLATS, PAGE 45, RECORDS OF KING COUNTY AUDITOR;

SITUATE IN THE CITY OF BURIEN, COUNTY OF KING, STATE OF WASHINGTON.

Commonly known as: 2655 SW 151 Place, Burien, Washington 98166.

8. **TERMINATION UPON DEATH.** Lender and Borrower expressly agree that this agreement, and all rights and duties pursuant hereto, immediately terminates upon the death of either party and is non-transferrable to the heirs, beneficiaries or assignees of either party.

Borrower and Lender each acknowledge that they execute this Note as a principal and not as a surety.

Principal and interest (if any) shall be payable in lawful money of the United States.

If legal action must be instituted to enforce any terms of this Note, the prevailing party agrees to pay such sum as the court may fix toward reasonable attorney's fees.

Dated this 28th Day of May, 2017.

**BORROWER:**                          **LENDER:**

Samia El-Moslimany                     Aziza M. Yousef

# Exhibit 19

# PROMISSORY NOTE

July 25, 2019
Riyadh, Saudi Arabia

    FOR VALUE RECEIVED, Samia El-Moslimany, a married person, (hereinafter "Borrower"), currently residing at 2655 SW 151 Place, Burien, Washington 98166, promises to pay to the order of the Aziza M. Yousef (hereinafter "Lender") the sum of ONE HUNDRED THOUSAND SAUDI ARABIAN RIYALS (SAR100,000.00) with ZERO (0%) interest per annum accruing on the unpaid principal, unless changed by subsequent mutual agreement of both parties in writing. All outstanding amounts are due and owing in full on or before the date of Maturity as set forth in Provision 2, below. Borrower and Lender acknowledge that they execute the instant Note with the intent that it supplements and sets forth additional, more detailed terms in a Promissory Note to be executed in Riyadh, Saudi Arabia by the Ministry of Justice, Saudi Arabia,

1. **PAYMENT PLACE.** Payment shall be made to Lender at her place of residence or at such other place as Lender may designate in writing by notice to Borrower. Payment shall be submitted to the following address:

    > P.O. Box 54301
    > Riyadh 11415
    > Saudi Arabia

2. **MATURITY.** The date of Maturity shall be the final day of the three hundred and sixtieth (360) month, or thirty (30) years, running from the above-referenced date of execution of this Note.

3. **WAIVERS.** Borrower and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

4. **GIVING OF NOTICES.** Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first-class mail to Borrower at the property address above or at a different address if Borrower has given Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by first-class mail to Lender at the address stated above or at a different address if Borrower is provided written notice of that address.

5. **OBLIGATIONS OF PERSONS UNDER THIS NOTE.** If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is guarantor, surety or endorser of this Note is also obligated pursuant to the terms of this Note. Any person, who takes over these obligations, including the obligations of a guarantor surety or endorser of this Note, is also obligated perform pursuant to all terms contained in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

6. **CHOICE OF LAW.** This Note shall be governed and enforceable pursuant to the applicable laws of the State of Washington.

7. **SECURITY. This Note shall be security by a Deed of Trust, recorded against the following property:**

    LOT 12 OF SEAHURST-WEST, AS PER PLAT RECORDED IN VOLUME 80 OF PLATS, PAGE 45, RECORDS OF KING COUNTY AUDITOR;

    SITUATE IN THE CITY OF BURIEN, COUNTY OF KING, STATE OF WASHINGTON.

    Commonly known as: 2655 SW 151 Place, Burien, Washington 98166.

8. **TERMINATION UPON DEATH.** Lender and Borrower expressly agree that this agreement, and all rights and duties pursuant hereto, immediately terminates upon the death of either party and is non-transferrable to the heirs, beneficiaries or assignees of either party.

Borrower and Lender each acknowledge that they execute this Note as a principal and not as a surety.

Principal and interest (if any) shall be payable in lawful money of the United States.

If legal action must be instituted to enforce any terms of this Note, the prevailing party agrees to pay such sum as the court may fix toward reasonable attorney's fees.

Dated this 25th Day of July, 2019.

**BORROWER:**                                    **LENDER:**

_____          _____
Samia El-Moslimany                               Aziza M. Yousef

# Exhibit 20



**20170227001230**
TODD & WELD        J              78.00
PAGE-001 OF 004
02/27/2017 14:59
KING COUNTY, WA

AFTER RECORDING, RETURN TO:

Suzanne Elovecky
Todd & Weld, LLP
One Federal Street, 27th Floor
Boston, MA 02110

## NOTICE OF JUDGMENT LIEN AGAINST HOMESTEAD PROPERTY

PLEASE TAKE NOTICE that Hayat Sindi has obtained a judgment against Samia El-

Moslimany, individually, and Ann El-Moslimany, individually, in the case of Hayat Sindi v.

Samia El-Moslimany and Ann El-Moslimany, in the United States District Court for the District

of Massachusetts, Civil Action No. 13-cv-10798-IT. The foreign judgment has been registered

with the United States District Court for the Western District of Washington as Case No. 17-MC-

001. A copy of the judgment is attached hereto as "Exhibit A" for recording purposes. Pursuant

to RCW 6.13.090, Hayat Sindi claims a lien on the value of the homestead property owned by

Samia and Ann El-Moslimany located at 2566 SW 151st Place, Burien, Washington, 98166, also

known as King County, Washington Parcel No. 764800-0120, as well as this and any other

property owned by Samia and Ann El-Moslimany pursuant to RCW 4.56.190, whether or not

any homestead exception applies. Hayat Sindi claims all rights afforded to her by law

concerning this lien.

Dated this 24th of February, 2017.

Hayat Sindi, by her attorneys:

David Rich (Mass. BBO No. 634275)
drich@toddweld.com
Suzanne Elovecky (Mass. BBO No. 670047)
selovecky@toddweld.com
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
617-720-2626

COMMONWEALTH OF MASSACHUSETTS    }
                                 }
COUNTY OF SUFFOLK                }

On this 24th day of February, 2017, personally appeared Suzanne Elovecky before me, a Notary Public in and for the Commonwealth of Massachusetts, to me known to be the individual described in and who executed the within and foregoing instrument, and acknowledged that she signed the same as her free and voluntary act and deed, for the uses and purposes therein mentoned.

WITNESS my hand and official seal hereto on February 24, 2017.

ELENA M. JOYCE
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
November 17, 2017

2017022700 1230.003

# 17-mc-00001



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HAYAT SINDI,                         *
                                     *
        Plaintiff,                   *
                                     *
    v.                               *       Civil Action No. 13-cv-10798
                                     *
SAMIA EL-MOSLIMANY and ANN           *
EL-MOSLIMANY,                        *
                                     *
        Defendants.                  *

## AMENDED FINAL JUDGMENT

October 6, 2016

This action was tried by a jury with U.S. District Judge Indira Talwani presiding, and the jury has rendered a verdict. Thereafter, the court has made further factual findings in support of a permanent injunction.

It is ordered that:

Plaintiff Hayat Sindi recover from Defendant Samia El-Moslimany the amount of $1,476,000 in compensatory and special damages; $631,808.88 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

Plaintiff Hayat Sindi recover from Defendant Ann El-Moslimany the amount of $344,000 in compensatory and special damages; $147,250.85 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

Rec# SEA082133

20170227001230.004

Defendants Samia El-Moslimany and Ann El-Moslimany are enjoined from repeating—orally, in writing, through direct electronic communications, or by directing others to websites or blogs reprinting Samia El-Moslimany's or Ann El-Moslimany's letters and comments—the statements:

1. That Hayat Sindi is an academic and scientific fraud;

2. That Sindi received awards meant for young scholars or other youth by lying about her age;

3. That Sindi was fraudulently awarded her PhD;

4. That Sindi did not conduct the research and writing of her dissertation;

5. That Sindi's dissertation was "ghost researched" and "ghost written";

6. That Sindi's role in the founding of Diagnostics For All was non-existent, and that Sindi did not head the team of six people that won the MIT Entrepreneurship Competition.

IT IS SO ORDERED.

October 6, 2016

/s/ Indira Talwani
United States District Judge

# Exhibit 21

# United States Court of Appeals
## For the First Circuit

_____

No. 16-2347

HAYAT SINDI,

Plaintiff, Appellee,

v.

SAMIA EL-MOSLIMANY and ANN EL-MOSLIMANY,

Defendants, Appellants.

_____

### JUDGMENT

Entered: July 11, 2018

This cause came on to be heard on appeal from the United States District Court for the District of Massachusetts and was argued by counsel.

Upon consideration whereof, it is now here ordered, adjudged and decreed as follows: The district court's judgment with respect to the claims of defamation, intentional infliction of emotional distress, and tortious interference with contract are affirmed, the judgment with respect to the claim for tortious interference with advantageous relations is reversed, and the post-trial injunction is vacated. All parties shall bear their own costs.

By the Court:

/s/ Margaret Carter, Clerk

cc:
Hon. Indira Talwani
Robert Farrell, Clerk, United States District Court for the District of Massachusetts
David H. Rich
Suzanne M. Elovecky
John Albert Kiernan
Mark R. Segalini
George R. White Jr.
Samia El-Moslimany
Ann Paxton El-Moslimany
Eugene Volokh

# Exhibit 22

**Return Address:**
**Law Offices of Anthony S. Wisen, PLLC**
Attn: Anthony S. Wisen, Esq.
1752 NW Market St., # 709
Seattle, WA 98107

Please print or type information **WASHINGTON STATE RECORDER'S Cover Sheet** (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)

1. Foreign Judgment 2. _____
3. _____ 4. _____

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page_____of document

**Grantor(s)** (Last name, first name, initials)
1. Samia El-Moslimany_____, _____
2. Ann El-Moslimany_____, _____

Additional names on page_____of document.

**Grantee(s)** (Last name first, then first name and initials)
1. Hayat Sindi_____, _____
2. _____, _____

Additional names on page_____of document.

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)
SEAHURST WEST ADD AND UND INT IN TRACTS B & C

Additional legal is on page_____of document.

**Assessor's Property Tax Parcel/Account Number** _____Assessor Tax # not yet assigned

763800-0120_____

The Auditor/Recorder will rely on the information provided on the form. The staff will not read the document to verify the accuracy or completeness of the indexing information provided herein.

I am requesting an emergency nonstandard recording for an additional fee as provided in RCW 36.18.010. I understand that the recording processing requirements may cover up or otherwise obscure some part of the text of the original document.

_____Signature of Requesting Party

CERTIFIED
COPY

FILED

2018 SEP -7 PM 12: 02

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

HAYAT SINDI,

        Judgment Creditor,

    v.

SAMIA EL-MOSLIMANY and ANN EL-
MOSLIMANY,

        Judgment Debtors.

No. **18 - 2 - 2 2 4 1 0 - 1 SEA** KNT

FOREIGN JUDGMENT

**CLERK'S ACTION REQUIRED**

FOREIGN JUDGMENT SUMMARY

A.    Judgment Creditor        Hayat Sindi

B.    Judgment Debtors        Samia El-Moslimany

                                     Ann El-Moslimany

FOREIGN JUDGMENT - 1

Law Offices of Anthony S. Wisen, PLLC
1752 NW Market St., #709
Seattle, Washington 98107
(206) 418-8720 · tony@wisenlaw.com

C.    Principal Judgment Amount          $1,076,000.00 (Samia El-
                                          Moslimany)
                                          $244,000.00 (Ann El-Moslimany)

D.    Pre-Judgment Interest              $460,233.21 (Samia El-Moslimany)
      (1/25/2013 through 8/18/2016)      $104,365.15 (Ann El-Moslimany)

E.    Post-Judgement Interest            $12,216.28 (Samia El-Moslimany)
      (8/19/2016 through 8/29/2018)      $2,770.24 (Ann El-Moslimany)

F.    Total Amount of Judgment, Less Costs   $1,548,449.49 (Samia El-
                                              Moslimany)
                                              $351,135.39 (Ann El-Moslimany)

G.    Costs (Pursuant to RCW 6.36.140)   $22.00

H.    Total Amount of Judgment with Costs   $1,548,471.49 (Samia El-
                                             Moslimany)
                                             $351,157.39 (Ann El-Moslimany)

I.    Attorneys for Judgment Creditor    Anthony S. Wisen
                                          Law Offices of Anthony S. Wisen,
                                          PLLC
                                          1752 NW Market St., #709
                                          Seattle, WA 98107

J.    Attorneys for Judgment Debtor      Elena Garella, Esq.
                                          927 N. Northlake Way, Ste. 301
                                          Seattle, WA 98103

                                          John A. Kiernan, Esq.
                                          Robert E. Koosa, Esq.
                                          Bonner Kiernan Trebach &
                                          Crociata, LLP
                                          40 Court St., Third Floor
                                          Boston, MA 02114

K.    Other:                             Foreign Judgment is from the
                                          United States District Court for the
                                          District of Massachusetts, Case No.
                                          1:13-cv-10798-IT

FOREIGN JUDGMENT - 2

Law Offices of Anthony S. Wisen, PLLC
1752 NW Market St., #709
Seattle, Washington  98107
(206) 418-8720  ·  tony@wisenlaw.com

**Instrument Number: 20180925000965  Document:J Rec: $106.00 Page-4 of 8**
**Record Date:9/25/2018 3:20 PM King County, WA**

20180925000965.004

|   |   |   |   |
|---|---|---|---|
| 1 | L. | Filing Date | August 17, 2018 |
| 2 | M. | Expiration Date | August 17, 2038 |

3  **TO CLERK OF THE COURT:** Pursuant to RCW 6.36.025 and 6.36.035, you are

4  requested to:

5      (1)    file the attached exemplified copy of the above-described foreign judgment in the

6  office of the Clerk of the above-entitled Court (see Exhibit 1).

7  DATED this 7ᵗʰ day of September, 2018.

8

9                   Law Offices of Anthony S. Wisen, PLLC
                 Attorneys for Judgment Creditor

10

11  By _____
                 Anthony S. Wisen, WSBA #39656

12

13

14

15

16

17

18

19

20

21

22

23

FOREIGN JUDGMENT - 3

Law Offices of Anthony S. Wisen, PLLC
1752 NW Market St., #709
Seattle, Washington 98107
(206) 418-8720 • tony@wisenlaw.com

EXHIBIT 1

✎AO 132 (Rev. 12/03) Exemplification Certificate

# UNITED STATES DISTRICT COURT

Eastern       District of       Massachusetts

## EXEMPLIFICATION CERTIFICATE

I, _____ Robert M. Farrell _____, Clerk of this United States District Court,
keeper of the records and seal, certify that the attached documents:

Second amended final judgment in CA No. 1:13-cv-10798-IT

are true copies of records of this Court.

In testimony whereof I sign my name and affix the seal of this Court, in this District at
Boston       on _August 24, 20__

*City*       *Date*

_Robert M. Farrell_       _Robert M. Farrell_

*Clerk*       *(By) Deputy Clerk*

I, _____ Indira Talwani _____, a Judicial Officer of this Court,
certify that _____ Robert M. Farrell _____, named above, is and was on the date noted,
Clerk of this Court, duly appointed and sworn, and keeper of the records and seal, and that this certificate, and
the attestation of the record, are in accordance with the laws of the United States.

_August 24, 2018_       _Indira Talwani_

*Date*       *Signature of Judge.*

United States District Judge

*Title*

I, _____ Robert M. Farrell _____, Clerk of this United States District Court,
keeper of the seal, certify that the Honorable _____ Indira Talwani _____,

*Judge*

named above, is and was on the date noted a Judicial Officer of this Court, duly appointed, sworn and qualified,
and that I am well acquainted with the Judge's official signature and know and certify the above signature
to be that of the Judge.

In testimony whereof I sign my name, and affix the seal of this Court at
Boston       in this State, on _August 24, 2018_

*City*       *Date*

## ROBERT M. FARRELL

*Clerk*       *(By) Deputy Clerk*

Case 1:13-cv-10798-IT   Document 268   Filed 08/17/18   Page 1 of 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HAYAT SINDI,

    Plaintiff,

v.

SAMIA EL-MOSLIMANY and ANN
EL-MOSLIMANY,

    Defendants.

Civil Action No. 13-cv-10798-IT

I hereby certify on 8/23/18 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☐ electronically filed original filed on
☑ original filed in my office on 8/17/18
Robert M. Farrell
Clerk, U.S. District Court
District of Massachusetts
By:
Deputy Clerk

SECOND AMENDED FINAL JUDGMENT

TALWANI, D.J.

    This action was tried by a jury with U.S. District Judge Indira Talwani presiding, and the jury has rendered a verdict. In accordance with the verdict, it is ordered that:

    Plaintiff Hayat Sindi recovers from Defendant Samia El-Moslimany the amount of $1,076,000 in compensatory and special damages; prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

    Plaintiff Hayat Sindi recovers from Defendant Ann El-Moslimany the amount of $244,000 in compensatory and special damages; prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.

    IT IS SO ORDERED.

Date: August 17, 2018

_____
United States District Judge

I, BARBARA MINER, Clerk of the Superior Court of the State of Washington,
for King County, do hereby certify that this copy is a true and perfect transcript
of said original as it appears on file and of record in my office and of the whole
thereof. IN TESTIMONY WHEREOF, I have affixed this Seal of said Superior
Court at my office, at Seattle on this date_____

SEP 1 3 2018

BARBARA MINER, Superior Court Clerk

By_____
Deputy Clerk                    M. GIVNIN